*In re* JOSÉ R. LÓPEZ DE VICTORIA BRÁS, querellado.

*Número:* CP-90-728          *Resuelto:* 6 de abril de 1994

*Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz* y *Anabelle Rodríguez, Subprocuradoras Generales,* e *Iván F. Fuster Lebrón, Procurador General Auxiliar,* abogados de El Pueblo; *Eliezer Aldarondo Ortiz* y *Miguel A. Pagán,*

abogados del querellado; *José Raúl López de Victoria Brás, pro se.*

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El 2 de octubre de 1990, el Procurador General de Puerto Rico radicó querella contra el Lcdo. José R. López de Victoria([1]) —abogado admitido por este Tribunal al ejercicio de la abogacía el 28 de abril de 1966—([2]) en la cual se expone, en síntesis, que el querellado incurrió en conducta impropia, contraria a las disposiciones del Canon 38 de Ética Profesional, 4 L.P.R.A. Ap. IX, al permitir que en su presencia y en ausencia del notario otorgante —Lcdo. Mario Báez y García— se firmara un contrato de arrendamiento, en el cual se hacía constar que se autenticaban las firmas de los otorgantes. La querella, además, imputa que el querellado permitió que, ante el mismo notario Báez y García,([3]) se otorgara una escritura en la cual el hijo de uno de los otorgantes fue el "testigo de huellas" de éste; debiendo saber, o sabiendo, que esto era impropio según la

---

([1]) Esta querella surge como secuela del caso *Latoni v. Latoni* (Caso Civil Núm. RE-85-556), sobre impugnación de testamento. Este Tribunal, el 4 de enero de 1990, al dictar resolución denegatoria de la revisión de la sentencia dictada el 11 de agosto de 1989 por el Tribunal Superior de Puerto Rico, Sala de Mayagüez, ordenó una investigación sobre la conducta profesional de los Lcdos. José R. López de Victoria y Mario Báez y García, en relación a los hechos narrados en dicha sentencia.

([2]) El 13 de mayo de 1966 le fue expedida autorización para ejercer la notaría en Puerto Rico.

([3]) El licenciado Báez y García falleció mientras se encontraba esta querella en investigación.

([4]) La querella imputa:

"PRIMER CARGO

"El Lcdo. José R. López de Victoria con conocimiento de que el notario autorizante del contrato de arrendamiento con fecha 28 de julio de 1983, sobre una casa de playa propiedad de Gerardo Latoni Lapatza, lo era el L[cdo.] Mario Báez y García; permitió que en su presencia y en ausencia del referido notario, Mario Báez García,

Ley Notarial vigente.([4]) Ley Notarial de Puerto Rico, 4 L.P.R.A. sec. 2001 *et seq.*

Después de recibir la contestación del querellado,([5]) el 1ro de febrero de 1991 nombramos al Lcdo. José Aponte Jiménez, ex Juez Superior, para que en calidad de Comisionado Especial recibiera la prueba y formulara las correspondientes determinaciones de hechos. El 16 de noviembre de 1992, el Comisionado Especial rindió su informe.

---

el Sr. Mariano Maldonado y su esposa, Elsie Matos, partes otorgantes en concepto de arrendatarios, firmaran el referido contrato.

"La referida conducta del Lcdo. José R. López de Victoria, constituye una desviación de las normas de conducta que debe observar todo miembro de la profesión legal, según establecido en el Canon 38, párrafo 1 del Código de Etica Profesional.

"SEGUNDO CARGO

"El Lcdo. José R. López de Victoria conociendo que el Lcdo. Mario Báez y García, Notario autorizante de la escritura número 6 de 24 de enero de 1986, sobre compraventa, se proponía utilizar al Dr. David Latoni Cabanillas como testigo de las huellas y para firmar por su señor Padre, Gerardo Latoni Lapatza, la referida escritura, procedió a entregar la escritura Núm. 6 de 24 de enero, supra, al Lcdo. Mario Báez y García para que éste procediera a autorizarla, como efectivamente lo hizo, utilizando al Dr. David Latoni Cabanillas como testigo de las huellas de su padre, Gerardo Latoni Lapatza y para firmar por su padre la referida escritura. El Lcdo. José R. López de Victoria por su condición de abogado notario, sabía o debió haber sabido que el Dr. Latoni Cabanillas por ser hijo de don Gerardo Latoni Lapatza, no podía ser utilizado legalmente como testigo de las huellas de su padre y para firmar por éste la escritura número 6 de 24 de enero de 1986. El haber permitido tal hecho pudiendo impedirlo, constituye una clara desviación a las disposiciones del Canon 38, párrafo 1 del Código de Etica Profesional por parte del Lcdo. José R. López de Victoria." Informe de 16 de noviembre de 1992, págs. 1–2.

([5]) El 2 de octubre de 1990, el Procurador General radicó la querella. El día 3 de ese mismo mes le concedimos quince (15) días al querellado para contestar la misma. El día 23 de octubre de 1990 recibimos una moción de prórroga, a la cual accedimos el 31 de octubre de 1990, concediéndole al querellado hasta el 25 de noviembre para contestar la querella. El 27 de noviembre de 1990 la parte querellante solicitó una nueva prórroga, a lo cual accedimos el 30 de noviembre de 1990, concediéndole hasta el 10 de diciembre de ese mismo año. El 4 de enero de 1991 este Tribunal al no recibir aún la contestación a la querella, le concedió al querellado hasta el día 15 de enero para presentar la misma, advirtiendo que de no ser así, se habrían de dar por admitidos los hechos imputados. El día 10 de diciembre de 1991 recibimos una moción solicitando que se considerara como contestación, el escrito de "solicitud de desestimación e informe del querellado" radicado el 28 de diciembre de 1990 ante este Tribunal. El 1ro de febrero de 1991, a la anterior solicitud de desestimación, concedimos un no ha lugar.

## I

De las determinaciones de hechos realizadas por el Comisionado se desprende que para el mes de julio de 1983, el Sr. Mariano Maldonado Torres se comunicó con el querellado —Lcdo. José R. López de Victoria— con la intención de indagar sobre un anuncio de arrendamiento referente a un inmueble(6) del Sr. Gerardo Latoni Lapatza, quien era suegro del querellado y quien se encontraba en ese momento físicamente incapacitado, no pudiendo inclusive firmar documentos. Luego de acordarse los términos del arrendamiento entre el señor Maldonado Torres y los hijos del señor Latoni, a saber: David, Gerardo y Sara, todos de apellidos Latoni Cabanillas —quienes por "acuerdo interno" administraban los bienes de su padre, sin intervención de autoridad judicial alguna— el señor Maldonado Torres y su esposa, la Sra. Elsie Matos Montalvo, acordaron acudir a la oficina del abogado querellado para formalizar el arrendamiento.

El 28 de julio de 1983, el señor Maldonado Torres y su esposa, luego de leer el contrato de arrendamiento —y *por instrucciones del querellado*— procedieron a firmarlo. En este momento se encontraban en la oficina del querellado únicamente la esposa de éste y su secretaria, *no encontrándose en la misma el notario Báez y García*. El contrato fue firmado, en adición, por los hijos del señor Latoni, "por s[í] y como mandatarios de su padre, Don Gerardo Latoni Lapatza". *Dicho contrato figura reconocido, y suscrito, ante el notario Mario Báez y García, bajo el número de afidávit 35,881 de fecha 28 de julio de 1983.* Según la declaración del Sr. David Latoni Cabanillas, el contrato que él firmó *no* contenía la parte correspondiente a la "Certificación del notario ante quien se otorgó".

El señor Maldonado Torres, posteriormente, recibió co-

---

(6) El inmueble es una edificación situada en la calle Comercio, Núm. 202, de la ciudad de Mayagüez.

pia del contrato, alegadamente por conducto del licenciado López de Victoria. El mismo no contenía la parte correspondiente a la certificación del notario Báez y García en la cual se autenticaban las firmas de los otorgantes y acreditativa de que el documento se suscribió por éstos en su presencia. Ante estos hechos el Comisionado Especial, licenciado Aponte Jiménez, determinó que:

> Del conjunto de la prueba presentada, no surge a solicitud de quién el licenciado Mario Báez y García autenticó las firmas del contrato. Tampoco c[ó]mo llegó hasta él. No podemos inferir que fue a través del querellado ni que éste prestó su consentimiento, particularmente cuando la copia que alegadamente le envía al señor Maldonado Torres, no parece notarizada unido al hecho de que las últimas personas que lo tuvieron en su poder fueron el doctor David Latoni Cabanillas y su hermano, Gerardo Latoni Cabanillas. Asumir lo contrario, a nuestro juicio, sería simple conjetura. *Concluimos, por consiguiente, que el primer cargo que se le imputa al querellado, no se probó.* (Énfasis suplido.) Informe de 16 de noviembre de 1992, pág. 4.

En cuanto al segundo señalamiento, surge del informe del Comisionado que tres (3) años más tarde, el abogado querellado, le ofreció al señor Maldonado Torres y a la esposa de éste venderle la propiedad del señor Latoni Lapatza, la cual ellos tenían en arrendamiento. El 24 de enero de 1986, el señor Maldonado y su esposa acudieron a la oficina del querellado a otorgar la escritura de compraventa de la propiedad arrendada. En dicha ocasión se encontraba presente el notario Báez y García, ante quien se otorgaría dicha escritura. El querellado les pidió que firmaran el documento de compraventa, dejando un espacio en blanco antes de sus firmas. El querellado los invitó, además, a la residencia del señor Latoni Lapatza para que presenciaran el momento en que se le "cogerían" las huellas dactilares a este último. *Éstos declinaron la invitación.*

Alegadamente, el licenciado Báez y García seleccionó al Dr. David Latoni Cabanillas —*hijo del otorgante*— para que actuase como "testigo de huellas" de su señor padre en la escritura de compraventa; *pero fue a petición del quere-*

*llado que el doctor Latoni acudió a casa de su padre para servir como testigo en la escritura de compraventa.* El doctor Latoni Cabanillas presenció el acto de imprimir su padre las huellas dactilares en la escritura; también estaba presente el notario Báez y García. *Cabe señalar que el querellado no estuvo presente.* A solicitud del licenciado Báez y García, el doctor Latoni Cabanillas intercaló a manuscrito en el espacio en blanco de la escritura, después del testimonio sobre la razón de su comparecencia, pero antes de las firmas del señor Maldonado y su esposa, la siguiente anotación: "Como testigo y a ruego de Don Gerardo Latoni Lapatza, quien no puede firmar por incapacidad física" (Informe de 16 de noviembre de 1992, pág. 6); procedió luego a firmar.[7] Ante estos hechos, el Comisionado Especial determinó que el licenciado Báez y García "juzgó por error que la [L]ey [N]otarial vigente para el 1986 permitía utilizar un hijo como testigo de las huellas de su padre, en una escritura, cuando éste no podía firmar", *no expresando*

---

[7] Según el señor Maldonado Torres, no recordaba haber visto, al firmar la escritura, el testimonio que antecede a su firma, en el cual se acredita que el Dr. David Latoni Cabanillas servía como testigo de las huellas de su padre. A esos efectos, dicha cláusula lee:

"Los comparecientes aceptan esta escritura en todas sus partes por hallarla conforme a sus deseos y, Yo, el Notario, Autorizante, les hice las advertencias legales pertinentes, inclusive la del derecho a uso de testigos, la cual es utilizada por el Vendedor, don GERARDO LATONI LAPATZA, por tener actualmente una letra casi ilegible por su avanzada edad, aclarándose que no existe ningún impedimento mental de dicho compareciente para otorgar este documento, pero habiéndole leído este documento y estando conforme con el mismo, acepta estampar sus huellas dactilares de sus dos dedos pulgares como si fuera su firma, ratificándose en todo lo aquí expuesto por ser esta su voluntad y como testigo y a ruego de don GERARDO LATONI LAPATZA, comparece su hijo DON DAVID LATONI CABANILLAS, mayor de edad, casado, propietario y vecino de Mayagüez, Puerto Rico. Y así lo otorgan todos los comparecientes el presente documento, los cuales firman ante mí, excepto don GERARDO LATONI LAPATZA, quien estampa sus huellas dactilares y previa lectura de este documento, después de advertirles el derecho que tenían de leerlo por sí al cual renuncian ante la lectura que hice Yo, el Notario, y estando conforme en su contenido se ratifican a continuación mediante la firma y las huellas dactilares, estampando las iniciales y las huellas dactilares en todos y cada uno de los folios de esta escritura, todo lo cual, Yo, el Notario Autorizante, CERTIFICO Y DOY FE." Informe de 16 de noviembre de 1992, págs. 5–6.

*nada sobre la conducta del licenciado López de Victoria.*([8]) Íd., pág. 7.

## II

█ De entrada, debe señalarse que este Tribunal *no* está obligado a aceptar el informe de un Comisionado Especial; esto es, podemos adoptar el mismo, modificarlo e, inclusive, rechazarlo. *Vélez Ruiz v. E.L.A.*, 111 D.P.R. 752, 757–758 (1981); *In re Soto López*, 135 D.P.R. 642 (1994). Aclarado este hecho, resolvemos.

█ No hay duda que las escrituras públicas otorgadas por el licenciado Báez y García fueron efectuadas en contravención a la legislación notarial, vigente al momento de los hechos.([9]) Con relación a la escritura de compraventa, en la cual los comparecientes firmaron en ausencia del notario que autenticaba sus firmas, la Ley para Regular el Ejercicio de la Profesión Notarial en Puerto Rico (en adelante Ley Notarial de 1956), 4 L.P.R.A. sec. 1001 *et seq.* (ed. 1978),([10]) disponía que los notarios eran los únicos funcionarios autorizados a dar fe y autenticidad *de los actos que ante su presencia se realizaban*, conforme a la ley, los contratos y demás actos extrajudiciales. 4 L.P.R.A. sec. 1001 (ed. 1978). Un notario *no* debía, *ni debe*, dar fe notarial de declaraciones juradas si la persona que va a autorizar la misma no comparece personalmente ante él, *In re Sánchez Ruiz*, 105 D.P.R. 848 (1977); es decir, un notario

---

([8]) Cabe señalar que la escritura del Contrato de Arrendamiento como la escritura de Compraventa las cuales sirven de génesis a esta querella no han sido objeto de impugnación por parte de sus partes contratantes ni de sus herederos.

([9]) Aunque los hechos aquí descritos fueron alegadamente cometidos por el licenciado Báez y García como notario, no nos corresponde pasar juicio sobre la conducta profesional de éste, por no estar ésto planteado ante este Tribunal.

([10]) Ley Núm. 99 de 27 de junio de 1956 (4 L.P.R.A. sec. 1001 *et seq.* (ed. 1978)).

no podía, ni puede, dar fe del conocimiento y firma de los otorgantes que no lo hacen ante su presencia.[11]

■ Por otra parte, y con referencia al hecho de que en la escritura de compraventa uno de los otorgantes fue testigo del otorgamiento, la Ley Notarial de 1956 *prohibía* que un pariente de uno de los otorgantes, dentro del cuarto grado de consanguinidad o segundo de afinidad, fuera *testigo* en el otorgamiento de un documento notarial. A esos efectos, la Sec. 15 de dicha ley disponía:

> Cuando de acuerdo con las secs. 1014, 1016 y 1027 de este título se requieran o permitan testigos para el otorgamiento de una escritura o documento público, *habrá unidad de acto*, y *no podrán ser testigos* los que no sepan firmar, los empleados o criados del notario autorizante, *ni los parientes del notario o de las partes interesadas, dentro del cuarto grado de consanguinidad o segundo de afinidad.* (Énfasis suplido.) 4 L.P.R.A. sec. 1015 (ed. 1978).

■ Más aún, dicha ley exigía *unidad de acto* en el otorgamiento de un documento en que por ley se requiere la comparecencia de testigos, es decir, que tanto el notario como los otorgantes y los testigos debían presenciar el acto de firmas de aquellos legalmente llamados a ésto.[12] *Ninguno de estos preceptos fueron observados en las escrituras otorgadas por el licenciado Báez y García en los dos (2)*

---

[11] A iguales efectos, véase Art. 2 y ss. de la Ley Notarial de Puerto Rico vigente, Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. sec. 2002 *et seq.*).

[12] La Sec. 14 de la Ley Notarial de 1956 (4 L.P.R.A. sec. 1014 (ed. 1978)) establecía el procedimiento en aquellos casos en que uno de los otorgantes no supiere o pudiere firmar, como en el caso del señor Latoni Lapatza, a saber:

"Si los otorgantes o alguno de ellos no supiere o no pudiere firmar, lo expresará así el notario y por los que no lo hagan firmará un testigo pero el notario deberá expresar estos conceptos en el instrumento, señalando por su nombre y apellido al testigo que a ruego de tal o tales firme. Además, junto a la firma del testigo y en todos los folios de la escritura, se fijarán las huellas digitales de los dos dedos pulgares y, si no los tuviese, de cualesquiera otros dedos del otorgante u otorgantes que no sepan firmar o no puedan verificarlo, y dicho testigo pondrá sus iniciales en cada uno de los folios de la escritura.

"Si el otorgante u otorgantes carecen de dedos en las manos, el notario expresará esta circunstancia y dos testigos firmarán a su ruego y estamparán sus iniciales según antes se indica."

*documentos notariales por él autorizados*; hechos alegadamente conocidos por el licenciado López de Victoria.[13]

## III

Es importante, en este punto, aclarar que la querella radicada contra el licenciado López de Victoria no está dirigida a sancionar su participación como notario en unas escrituras alegadamente otorgadas en contravención a la Ley Notarial de 1956 *y sí a sancionar su conducta al alegadamente permitir que, bajo su conocimiento y aceptación, se otorgaran unas escrituras en contra de lo preceptuado en la Ley Notarial vigente*; conducta impropia a la luz de lo preceptuado por el Canon 38 del Código de Ética Profesional, *supra*.

■ Como es sabido, el Canon 38 antes mencionado establece, en su primer párrafo, que:

*El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión,* aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradables pero que redundan en beneficio de la profesión, tales como: denunciar valientemente, ante el foro correspondiente, todo tipo de conducta corrupta y deshonrosa de cualquier colega o funcionario judicial; aceptar sin vacilaciones cualquier reclamación contra un compañero de profesión que haya perjudicado los intereses de un cliente; poner en conocimiento de las autoridades apropiadas todo acto delictivo o de perjurio que ante él se cometiera; velar y luchar contra la admisión al ejercicio de la profesión de personas que no reúnan las condiciones morales y éticas, así como de preparación aca-

---

[13] Con relación al cargo radicado por el Procurador General en el cual se le imputa al licenciado López de Victoria el permitir que en su presencia se firmara un contrato, en el cual el notario no se encontraba presente, el Comisionado Especial no encontró prueba que sustentara el mismo; por ende, no tomaremos acción al respecto.

démica, que nuestra profesión presupone. Todo abogado debe estar convencido de las condiciones idóneas, morales y éticas de un aspirante al ejercicio de la profesión antes de recomendarle para su admisión al foro. (Énfasis suplido.) 4 L.P.R.A. Ap. IX.

██ .Reiteradamente este Tribunal se ha expresado a los efectos de que los cánones de ética profesional le exigen a todo abogado ejercer la profesión con sinceridad y honradez, así como conducirse no sólo en el desempeño de su profesión, sino en su vida privada de manera digna y honorable. *In re Santiago González*, 121 D.P.R. 580 (1988); *In re Roldán Figueroa*, 106 D.P.R. 4 (1977). Este compromiso solemne, no sólo de conducir su persona de acuerdo a las exigencias de los cánones de ética profesional, *se extiende también a velar por que la conducta de sus compañeros de profesión se rija igualmente por dichas exigencias.* Véase Preámbulo del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 1 n.

██ En situaciones anteriores, este Tribunal no tan sólo ha sancionado a aquel abogado que incurre en una falta a la ética profesional en la redacción de un documento notarial, *sino también a aquel abogado que induce o promueve la irregularidad.* A esos efectos, en *In re Ríos Rivera*, 119 D.P.R. 586 (1987), expresamos que constituye una violación al Canon 38 del Código de Ética Profesional, ante, aquel abogado que *induce* a otro compañero notario a que autorice una escritura sin la comparecencia de uno de los otorgantes. A iguales efectos, en *In re Del Río Rivera y Otero Fernández*, 118 D.P.R. 339 (1987), expresamos que infringe la ética profesional no tan sólo el abogado que asesora, redacta u otorga un documento simulado, *sino también aquel que conociendo la ilegalidad del acto promueve su realización.*

De los testimonios recibidos, y del informe del Comisionado, *se desprende que el licenciado López de Victoria incurrió en conducta antiética al tener conocimiento de que se iba a otorgar una escritura en forma impropia, ayudando a*

*la realización de ésta.* Del testimonio del doctor Latoni se desprende que el licenciado López de Victoria *indujo* a éste a servir como testigo de la escritura, señalándole que eso era "completamente legal".[14]

Aunque el licenciado López de Victoria no autorizó la escritura de compraventa, éste violó el Canon 38 del Código de Ética Profesional, *supra, al ayudar* a otorgar un documento notarial en violación de dicha ley. *In re Ríos Rivera,* supra, pág. 592; *In re Del Río Rivera y Otero Fernández,* supra, pág. 345. Éste *sabía, o debió saber,* que la escritura en la cual el doctor Latoni servía como testigo de firma de su padre era una contraria al Derecho.[15] Después de todo, es deber de todo notario, como profesional del Derecho, conocer las leyes, la doctrina, las costumbres y la jurisprudencia. *In re Feliciano Ruiz,* 117 D.P.R. 269 (1986).

Aunque los comparecientes no eran sus clientes, ni autorizó el documento, su "participación" en la transacción *aparentaba dar cierto vicio de legalidad y confiabilidad a los mismos.* Debe recordarse que todo abogado debe evitar hasta la apariencia de conducta impropia. Canon 38 del Código de Ética Profesional, *supra.*

Por otro lado, aun cuando el licenciado López de Victoria no participara directamente en la otorgación de la escritura, *era su deber advertir al notario Báez y García de la violación a la Ley Notarial en la que iba a incurrir en la otorgación de dicha escritura.* Después de todo, todo abogado tiene el deber de esforzarse al máximo en la exalta-

---

[14] Véase T.E., págs. 202–205.

[15] La posición del licenciado López de Victoria es a los efectos de que:

"El Canon Número 38 de Etica Profesional no va dirigid[o] a sancionar a un abogado o notario por actuaciones de otro y que se encuentren fuera del control, manejo o intervención personal.

"La actuación del Honorable Procurador constituye un procedimiento que establecería una trayectoria para juzgar a cualquier abogado, que aunque no intervenga en el procedimiento sería sancionado por su simple relación con las partes y que 'tienda a demostrar' su participación sin actuación directa." Informe de conferencia entre abogados, pág. 2.

ción del honor y de la dignidad de su profesión, incluyendo el deber de denunciar voluntariamente, ante el foro correspondiente, todo tipo de conducta deshonrosa de cualquier miembro de la profesión. Canon 38 del Código de Ética Profesional, *supra*.

Por todo lo expuesto, resolvemos que el licenciado López de Victoria infringió las disposiciones del Canon 38 del Código de Ética Profesional, *supra*. Tomando en consideración el hecho de que la actuación del querellado no perjudicó a ninguna persona y, en adición, el hecho de que su récord profesional es uno libre de manchas, *estimamos procedente únicamente, como sanción, una amonestación; apercibiéndole para que en el futuro se ciña estrictamente a las disposiciones de los cánones de ética profesional.*

*Se dictará sentencia de conformidad.*

El Juez Presidente Señor Andréu García no intervino. El Juez Asociado Señor Negrón García no intervino. El Juez Asociado Señor Hernández Denton disintió "por entender que el querellado no infringió el Canon 38 del Código de Ética Profesional. A diferencia de *In re Ríos Rivera*, 119 D.P.R. 586 (1987), e *In re Del Río Rivera y Otero Fernández*, 118 D.P.R. 339 (1987), en este caso no se demostró que el querellado participara conscientemente de un fraude o que por la naturaleza de la situación cualquier abogado hubiera sospechado de ilegalidad. Más aún, la actuación del querellado no fue relacionada al ejercicio de su profesión, no constituye acto delictivo ni implica depravación moral", expresión a la que se unió la Juez Asociada Señora Naveira de Rodón.