per curiam:
Al Ledo. Eliseo Gaetán y Mejías (querellado) lo investigó la Oficina de la Administración de los Tribuna-les (OAT) por ciertas actuaciones relacionadas al proceso de su renominación durante el 2007. Dicha investigación arrojó un Informe en el cual se concluyó que éste incurrió en violaciones al Canon 29 de Ética Judicial, 4 L.P.R.A. Ap. IV-A, y a los Cánones 9 y 38 del Código de Ética Profesio-nal, 4 L.P.R.A. Ap. IX. Como consecuencia de esto, el resul-tado del Informe sobre la conducta del querellado se refirió a la Comisión de Disciplina Judicial (Comisión de Disci-plina) para la acción correspondiente.
A su vez, la Comisión de Disciplina concluyó que el que-rellado incurrió en las violaciones éticas señaladas y pre-sentó la querella correspondiente. Luego de los trámites de rigor, se designó una Comisionada Especial para atenderla. Culminado este proceso, la Comisionada Especial sometió su Informe, el cual nos ha remitido y estamos prestos a ponderar.
*850 I
El Ledo. Elíseo Gaetán y Mejías fue admitido al ejercicio de la abogacía el 6 de junio de 1983. Posteriormente, el 18 de diciembre de 1995, prestó juramento como juez superior y ejerció su cargo en distintas regiones judiciales. Durante los últimos cuatro (4) años de su término estuvo asignado a la Sala de Guaynabo del Tribunal de Primera Instancia. Una vez venció su nombramiento, el 18 de diciembre de 2007, el Gobernador de Puerto Rico le extendió un nombra-miento de receso al mismo cargo de juez superior. De esta manera, fue asignado a la Región Judicial de Humacao. El querellado cesó en su cargo el 30 de jimio de 2008, luego de que el Senado de Puerto Rico no considerara su nombra-miento.
Mientras el querellado se desempeñaba como juez superior en la Sala de Guaynabo, solicitó renominación al cargo de Juez de Primera Instancia o ascenso al Tribunal de Apelaciones. El 11 de abril de 2007, la Comisión de Eva-luación Judicial (Comisión de Evaluación) lo evaluó y rin-dió un Informe en el que determinó que el querellado no estaba calificado para renominación o para ascenso.
Posteriormente, el 9 de mayo de 2007, el querellado se comunicó por escrito con la Comisión de Evaluación para expresar su insatisfacción con el resultado de su evalua-ción y solicitó una prórroga de treinta (30) días para reco-pilar la información necesaria con relación a sus cualifica-ciones como juez y debatir la determinación de que no estaba calificado. La Comisión de Evaluación accedió a su petición y le concedió la prórroga solicitada; además, le concedió la oportunidad de comparecer nuevamente a pre-sentar sus objeciones con los criterios que se expresaron en el Informe. Además, la Comisión de Evaluación le envió al querellado una lista que desglosaba los comentarios nega-tivos que recibió sobre su desempeño como juez superior. Se le indicó que no estaban incluidos aquellos comentarios cuyo contenido permitía revelar la identidad del entrevistado. Asimismo, le solicitó que presentara un es- *851 crito con el resumen de los fundamentos que presentaría ese día.
El 20 de mayo de 2007, el querellado suscribió una carta —dirigida a abogados y abogadas— en papel encabezado con un membrete que hace referencia a su posición de juez superior. A continuación transcribimos la carta:
From The Desk of Elíseo Gaetan y Mejias Superior Court Judge
“Invoke the imagination, Provoke the senses, Evoke the emotions, ... for creative thinking and knowledge.”
G. Laliberté E. Gaetán
Distinguido Letrado
Nos dirigimos a usted porque estamos seguros de que no cree en que la maldad deba prevalecer sobre el bien ni la injusticia sobre la justicia.
Por lo anterior, si usted considera que nos hemos desempe-ñado adecuadamente en la función judicial, nos urge que tenga a bien en hacer una carta dirigida a:
Sr. Hugo Díaz-Director
Oficina de Nombramientos Judiciales
La Fortaleza, San Juan, P.R. 00901
Estando en la etapa final de evaluación para el Tribunal de Apelaciones, el Hon. Francisco Rebollo López, en su carácter de Presidente del Comité Evaluador, nos ha dado como no cua-lificados ni para el Tribunal de Apelaciones ni para renomina-ción al Tribunal Superior. Esto sin duda es una agenda de algún enemigo invisible que nos persigue desde Arecibo y que hasta ahora ha logrado que no sean justos en la evaluación. No tenemos otra forma de defendemos de esta infamia, toda vez que se nos negó tener acceso a los formularios de evalua-ción que tenían los abogados y fiscales consultados sobre el particular. Los renglones en que se nos ha indicado como no cualificados en escala del 1 al 6 son los siguientes:
1. Reputación intelectual No cualificado
2. Destrezas profesionales No cualificado
3. Destrezas de comunicación No cualificado
4. Temperamento judicial No cualificado
5. Calidad de labor No cualificado
6. Juicio valorativo No cualificado
Ante este atropello a la dignidad del ser humano, no nos *852 queda otro recurso que dirigirnos a usted para que nos apoye con el envío de una carta y que la misma nos sea entregada cerrada y una copia para nuestro récord, para solicitar una cita con el Sr. Hugo Díaz, de manera que podamos explicar con prueba que contradiga la errónea apreciación de la Comisión, quien dich[o] sea de paso, ninguno de sus componentes ha estado en nuestra Sala para palpar realmente el desempeño en la función judicial.
Con el testimonio de nuestro aprecio quedamos de usted.
Fdo. Elíseo Gaetán y Mejías. (Enfasis suprimido.) Querella, Exhibit 1.
El 28 de junio de 2007, la Directora Administrativa de la OAT, luego de recibir una copia de la preterida carta, le remitió una misiva al querellado en la que le solicitó que cesara y desistiera de inmediato de continuar diseminando la consabida carta. Esto con el propósito de que no conti-nuara afectando la imagen de su persona como juez y el de la Rama Judicial. Le señaló que, de su faz, aparentaba surgir una violación al Canon 29 de Etica Judicial, supra, y le comunicó que se había iniciado una investigación al respecto. Asimismo, se le concedió un término de diez (10) días para que expusiera su posición por escrito sobre el contenido de la carta y se le informó que de no comparecer se continuaría con la investigación sin el beneficio de su comparecencia. La comunicación de la Directora incluyó copia de los documentos que motivaron el inicio de la investigación.
El 16 de julio de 2007, el querellado suscribió una carta dirigida al Juez Presidente Señor Hernández Denton, con copia a todos los Jueces Asociados. Cabe destacar que el querellado acompañó su comunicación con numerosas car-tas de recomendación firmadas por más de sesenta (60) abo-gados y abogadas que tuvieron experiencias en las salas presididas por él. En síntesis, el querellado objetó la evalua-ción que le hizo la Comisión de Evaluación y solicitó que se evaluara su solicitud de reconsideración con relación al re-sultado de la evaluación que le hizo la Comisión de Evaluación. Además, informó que había declinado compare- *853 cer ante la Comisión de Evaluación por segunda ocasión, por no “inspiramos dicha Comisión ninguna confianza al darle credibilidad a meros comentarios y alegaciones, que en nin-gún Tribunal hubieran sido admitidas”. Querella, Exhibit 6. Acotó que “la Comisión de Evaluación Judicial, en nuestro caso particular, no ha actuado en la forma justa, imparcial y diligente que requiere su delicada encomienda” (id.); la Co-misión “nos ha negado el derecho a examinar los formula-rios que le dan base a su aberrada evaluación” (id.); la Co-misión “[h]a llegado a unas conclusiones sobre nuestra labor totalmente sesgadas (biased) que no recogen en su conte-nido estocástico (aleatorio) la función judicial que hemos realizado” (id.).
Asimismo, el querellado señaló que “no le deslumbran las candilejas ni las frivolidades, como el aparecer en la Internet en el Cuadro de Honor de Jueces Excelentes, en una foto oficial ni en algún certificado de reconocimiento” (Querella, Exhibit 6); que lo habían tratado como a una “cosa” u “objeto” (id.). Por último, expresó que si tuviera que abandonar la Rama Judicial lo haría “con la frente en alto, con la satisfacción del deber excelsamente cumplido y, sobre todo, con el mal sabor de que los llamados por anto-nomasia a impartir justicia, y teniendo la oportunidad de hacerlo, no lo hicieron con uno de sus pares” (id.).
El 7 de agosto de 2007, el querellado envió una nueva carta al Juez Presidente en la cual indicó que le habían notificado de la querella que la OAT inició en su contra y solicitó su desestimación. Así también, adujo que el Canon 29 de Etica Judicial adolecía de vaguedad por prohibir ges-tiones indebidas sin establecer lo que era indebido, y que violaba el principio de legalidad por no establecer penali-dad alguna por su incumplimiento. Sostuvo que los Cáno-nes de Etica Judicial de 2005 creaban una clasificación in-herentemente sospechosa de discrimen por condición social, porque no aplicaban a los Jueces y a las Juezas del Tribunal Supremo, en violación a la igual protección de las leyes. Esta carta fue considerada como una moción de des- *854 estimación de la acción que tomó la Directora Administra-tiva y mediante Resolución de 24 agosto de 2007 resolvió que era improcedente.
El 11 de septiembre de 2007, la entonces Subsecretaria de Justicia, Lizette Mejías, le cursó a la Directora de la OAT una carta con fecha de 11 de septiembre de 2007, en la cual informó que el entonces Secretario de Justicia, Roberto J. Sánchez Ramos, había recibido una carta suscrita por el entonces juez Gaetán —de 31 de agosto de 2007— en la cual le informaba que su nombramiento vencía el 17 de diciembre de 2007 y expresaba su agradecimiento a los abogados y fiscales del Departamento de Justicia que ha-bían postulado ante él a lo largo de su carrera judicial. A esta comunicación adjuntó copia de cuarenta y siete (47) cartas de abogados que habían postulado ante él y que, a su vez, éstos le habían enviado al señor Hugo Díaz para abogar por su renominación.
Así las cosas, y como parte de la investigación que rea-lizó la OAT, sus investigadores tomaron declaraciones ju-radas a distintos abogados que habían suscrito cartas para recomendar al querellado. De estas declaraciones juradas surge que las cartas de recomendación se remitieron tanto en fechas anteriores como en fechas posteriores a la comu-nicación que el querellado recibió de parte de la Directora Administrativa de la OAT solicitándole que desistiera de dicha práctica.
El 13 de noviembre de 2008, la OAT rindió su informe sobre la investigación que solicitó el Juez Presidente. En éste se concluyó que las actuaciones del querellado habían violado el Canon 29 de Etica Judicial, supra, así como los Cánones 9 y 38 del Código de Etica Profesional, supra. Se recomendó referir la queja a la Comisión de Disciplina para la correspondiente querella y trámite.
El 16 de enero de 2009, luego de recibido el Informe de Investigación, en el que la Comisión de Disciplina deter-minó causa probable y dispuso que se presentara la quere-lla correspondiente, este Tribunal designó a la Leda. Cri-santa González Seda para que recibiera la prueba y *855 rindiera el informe pertinente. Posteriormente, mediante Resolución de 2 de febrero de 2009, el Tribunal refirió la querella a la Oficina del Procurador General para que com-pareciera como parte querellante en los procedimientos que se llevarían a cabo de acuerdo con la Regla 14 del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-A.
El 13 de marzo de 2009 el querellado compareció a con-testar la querella presentada. Solicitó su desestimación por considerar que la conducta que se le imputaba ocurrió mientras él se desempeñaba como juez. Señaló que los cá-nones de ética profesional rigen la conducta de los aboga-dos, pero no de los jueces en funciones. Asimismo, sostuvo que las cartas que él envió no se pueden catalogar contra-rias a los Cánones 9 y 38 del Código de Ética Profesional, supra. Además, argüyó que no procedía concluir que había incumplido con el Canon 29 de Ética Judicial, supra, por-que cuando se emitió el Informe de Investigación ya él no fungía como juez. También señaló que aunque para propó-sitos de argumentación se asumiera que el contenido de las cartas era contrario a lo dispuesto en los cánones que se le imputaban, ya él había sido sancionado cuando, al exten-dérsele un nombramiento de receso en diciembre de 2007, fue asignado a la Región Judicial de Humacao.
Luego de varios incidentes procesales, el 31 de marzo de 2009 se celebró una vista sobre los procedimientos en la que el caso quedó sometido mediante el expediente —a pe-tición de la Oficina de la Procuradora General— para que lo resolviera la Comisionada Especial. El 17 de diciembre de 2009, ésta nos remitió el informe culminado. Concluyó que la conducta del querellado estaba reñida con el Canon 29 del Código de Ética Judicial, supra, por lo que se confi-guró una violación de los Cánones 9 y 38 del Código de Ética Profesional, supra. El querellado no ha argüido contra el Informe de la Comisionada y tampoco nos ha solici-tado término para hacerlo. Así, el asunto queda sometido ante nuestra consideración para su resolución.
*856 II
En primer orden debemos atender el argumento juris-diccional esbozado por el querellado. Este señala que no tenemos jurisdicción para sancionarlo porque la conducta que se le imputa ocurrió mientras se desempeñaba como juez. Por tal razón, sostiene que no cabe encontrarlo in-curso en una violación a los cánones de ética judicial.
La jurisdicción disciplinaria del Tribunal Supremo de Puerto Rico sobre los jueces y las juezas del Tribunal de Primera Instancia y del Tribunal de Apelaciones emana de la Sec. 11 del Art. V de la Constitución de Puerto Rico, L.P.R.A., Tomo 1.(1) Según el palio de ese mandato constitucional, este Tribunal aprobó los Cánones de Etica Judicial de 2005 (4 L.P.R.A. Ap. IV-B), los cuales pautan las normas mínimas de conducta que todo juez y toda jueza deben observar rigurosamente. In re Scherrer Caillet-Bois, 162 D.P.R. 842, 858 (2004).
Los Cánones de Ética Judicial están dirigidos a reglamentar la conducta de los abogados o las abogadas que se desempeñen como jueces o juezas. Sin embargo, he-mos sostenido que la renuncia de un querellado o una querellada a su posición en la Judicatura o la expiración del término de su nombramiento no es óbice para que este Tribunal pase juicio sobre aquellas acciones en que éste o ésta incurrió mientras fungía como juez o jueza y que enmarquen violaciones a dichas normas de comportamiento. In re Suárez Marchán, 159 D.P.R. 724, 735 (2003); In re Campoamor Redín, 150 D.P.R. 138, 149 (2000); In re Liceaga, 82 D.P.R. 252, 257 (1961). Cónsono con eso, hemos resuelto que el cese en las funciones de un magistrado o una magis- *857 trada, ya sea por motivo de renuncia, por la no renomina-ción o por la separación del cargo, no impide que se conti-núe el proceso disciplinario si la naturaleza de la conducta imputada puede dar lugar al desaforo, a la suspensión de la abogacía o a otras medidas disciplinarias. In re Campoamor Redín, supra, pág. 149.
De la misma manera, la Regla 33(a) de Disciplina Judicial, 4 L.RR.A. Ap. XV-B, establece:
... La renuncia o la expiración del término del nombra-miento de la jueza o del juez querellado no impedirá que con-tinúe el procedimiento disciplinario en su contra al amparo de este reglamento. La Comisión determinará si la conducta amerita la recomendación de imponerle a la juez o al juez que-rellado medidas disciplinarias por violación al Código de Etica Profesional. Véase In re Lugo Rodríguez, 149 D.P.R. 551, 555 (1999).
Es decir, el hecho de que un abogado o una abogada no ocupe su cargo como juez o jueza, no nos impide concluir, si los hechos así lo demuestran, que ha incurrido en conducta reñida con los cánones de ética profesional. Según señala-mos en In re Scherrer Caillet-Bois, supra, pág. 859, esto es así porque determinar lo contrario sería atentar contra el propósito social de evitar que la justicia se vea frustrada al tornarse académica una querella por el sólo hecho de que un juez o una jueza cese en su cargo. Asimismo, resultaría incompatible con la facultad inherente que tiene este Tribunal para reglamentar el ejercicio de la abogacía. Id.; In re Suárez Marchán, supra, pág. 735.
Por lo tanto, la no confirmación del querellado y el he-cho de que ya no se desempeña como juez, no priva a este Tribunal de pasar juicio sobre sus actuaciones mientras fue miembro de la Judicatura y determinar si infringió al-guno de los cánones de ética profesional.
III
Como ya indicamos, la Comisionada Especial concluyó en su Informe que las actuaciones del querellado violaron *858 el Canon 29 de Ética Judicial, supra. Además, acotó que como tales actos tienen implicaciones que trascienden las responsabilidades del querellado como juez, y se proyectan en su carácter personal y en su vida profesional como abo-gado, constituyen violaciones a los Cánones 9 y 38 del Có-digo de Ética Profesional, supra.
A priori, no albergamos duda de que los hechos que determinó la Comisionada Especial en su Informe reflejan que la conducta del querellado, mientras se desempeñó como Juez del Tribunal de Primera Instancia, constituyó una violación al Canon 29 de Ética Judicial, supra. Este canon requiere que los jueces y las juezas se abstengan de realizar gestiones indebidas para lograr ascensos, obtener una renominación a la Judicatura o para obtener cualquier otro cargo público. Id. Esta prohibición incluye todo tipo de gestión indebida tanto para beneficio del juez como a favor de otras personas, pero excluye los trámites oficiales ante los organismos que asesoran al Poder Ejecutivo y al Poder Legislativo sobre nombramientos judiciales. íd.
Como ya hemos apuntado, el juez y la jueza, para merecer el respeto de la sociedad y que se acaten sus decisiones, tiene que ser y proyectarse como ser humano sin tacha. Es decir, no solamente tiene que ser bueno o buena, sino también parecerlo. In re Hernández Torres, 167 D.P.R. 823, 848 (2006), citando a C.J. Irizarry Yunqué, La Ética Judicial, Año 9 (Núms. 1-4) Forum 4 (octubre 1993). Los magistrados y las magistradas se convierten en depositarios de la confianza del Pueblo de que la administración de la justicia la llevarán a cabo personas de una conducta intachable. In re Robles Sanabria, 151 D.P.R. 483, 510 (2000). Por lo tanto, esta confianza obliga al juez y a la jueza a ser previsores y analizar las posibles consecuencias de sus actos en términos de las impresiones que podrían recibir terceras personas, y deben estar pendientes de situaciones que puedan afectar negativamente su imagen. In re Hernández Torres, supra; In re Suárez Marchán, supra, *859 pág. 740; In re Ortiz Rivera, 163 D.P.R. 530, 536 (2004). Por eso, este Tribunal ha sido consecuente al señalar que la profesión judicial no admite términos medios. In re Nevárez Zavala, 123 D.P.R. 511, 524 (1989).
El prestigio del juez y de la jueza no es un activo que se deba utilizar para gestionar privilegios o concesiones que, de otro modo, no se hubieran obtenido. In re Almodovar Marchany, 167 D.P.R. 421, 434 (2006). El prestigio del cargo y la reputación bien ganada sólo pueden ser carta de presentación en el ejercicio de las funciones judiciales. Id. Por ello, los jueces y las juezas deben ser sumamente cuidadosos y cuidadosas, y prudentes al mane-jar asuntos exógenos a la función judicial para evitar crear la apariencia de que utilizan el título de juez o jueza como instrumento de intimidación o para imprimir mayor peso a sus reclamos personales. Id.
Por consiguiente, estamos convencidos de que la carta que envió el querellado a los abogados y a las abogadas para que recomendaran su renominación o ascenso con el Director de la Oficina de Nombramientos Judiciales en la Fortaleza, no es una gestión legítima en el proceso de soli-citar formalmente esa renominación o ascenso. Por medio de dicha carta solicitaba que lo recomendaran solamente si consideraban que el querellado se desempeñaba adecuada-mente en la función judicial. Tal actuación lo colocó en una posición en la cual su imparcialidad se podía cuestionar porque la carta daba la impresión de que los abogados y las abogadas que no lo recomendaran no consideraban que el querellado se desempeñaba adecuadamente. A tal efecto, es razonable colegir que el abogado o la abogada que reci-biera dicha solicitud podía pensar que si se negaba a en-viar la carta, los casos que tenía con el juez podían afectarse. Esto, en definitiva, es contrario al Canon 29 de Etica Judicial, supra.
Ahora bien, el 30 de junio de 2008, el licenciado Gaetán y Mejías cesó en su cargo como juez luego de que el Senado de Puerto Rico no considerara su nombramiento. Así, el *860 hecho de que el licenciado Gaetán y Mejías ya no forma parte de la Judicatura nos impide sancionarlo de acuerdo con los cánones de ética judicial. Véanse: In re Busó Aboy, 166 D.P.R. 49, 60-61 (2005); In re Saavedra Serrano, 165 D.P.R. 817, 828-829 (2005); In re Suárez Marchán, supra, pág. 745; In re Lugo Rodríguez, supra. Por consiguiente, nos enfocaremos a examinar su conducta según las dispo-siciones de los cánones del Código de Etica Profesional.
IV
En innumerables ocasiones hemos aseverado, con rela-ción a casos de conducta profesional, que este Tribunal no está obligado a aceptar el Informe de un Comisionado Especial. Podemos adoptar el Informe, modificarlo e, in-cluso, rechazarlo. In re Semidey Morales, 151 D.P.R. 842, 844 (2000); In re López de Victoria Brás, 135 D.P.R. 688, 695 (1994); In re Soto López, 135 D.P.R. 642, 646 (1994); Vélez Ruiz v. E.L.A., 111 D.P.R. 752, 757-758 (1981). Pre-cisamente, en el presente caso no coincidimos totalmente con la apreciación jurídica de la Comisionada Especial, se-gún expuesta en su Informe, con relación a la aplicación del Canon 9 del Código de Etica Profesional, supra, en el contexto del presente caso.
De entrada, creemos que el querellado no infringió dicho postulado. Esta norma dispone:

Conducta del abogado ante los tribunales

El abogado debe observar para con los tribunales una con-ducta que se caracterice por el mayor respeto. Ello incluye la obligación de desalentar y evitar ataques injustificados o aten-tados ilícitos contra los jueces o contra el buen orden en la administración de la justicia en los tribunales. En casos donde ocurrieren tales ataques o atentados, el abogado debe interve-nir para tratar de restablecer el orden y la buena marcha de los procedimientos judiciales.
El deber de respeto propio para con los tribunales incluye también la obligación de tomar las medidas que procedan en ley contra funcionarios judiciales que abusan de sus prerroga-tivas o desempeñan impropiamente sus funciones y que no *861 observen una actitud cortés y respetuosa. (Énfasis nuestro.) Canon 9 del Código de Ética Profesional, supra.
Al interpretar el citado Canon 9, hemos señalado que éste requiere “que los abogados, cuando hayan de dirigirse al tribunal —aún para criticarle— lo hagan con respeto y deferencia”. In re Crespo Enriquez, 147 D.P.R. 656, 662-663 (1999). Es decir, se trata de un postulado que rige la conducta de los abogados frente al tribunal, tal y como lo sugiere el propio título del Canon.
De una simple lectura de este principio deontológico surge que se refiere a la conducta de los abogados ante los tribunales. Se trata de la imposición de un deber de com-portamiento exclusivamente dirigido a los abogados y las abogadas, y no a los jueces y las juezas. De ahí que el canon imponga como deber que el abogado y la abogada desalienten ataques injustificados contra los jueces y las juezas o el buen orden en la administración de la justicia y no viceversa. Es decir, el Canon no impone a los jueces y a las juezas el deber de desalentar ataques injustificados contra los mismos jueces y juezas o el buen orden en la administración de la justicia. El deber impuesto es exclu-sivo para los abogados.
El Canon 9 del Código de Ética Profesional, supra, esta-blece que los abogados y las abogadas tienen el deber de velar por la conducta y el comportamiento de los funciona-rios y las funcionarlas judiciales, entre los cuales resalta evidentemente la figura del juez o la jueza. Por ende, del propio lenguaje del Canon 9 surge de forma conspicua que éste se diseñó para regular el comportamiento de los abo-gados y las abogadas con relación al tribunal y a los jueces y las juezas; no así el comportamiento de los jueces y las juezas.
De hecho, este Tribunal ha sostenido que este precepto está dirigido a regular la conducta del abogado litigante en corte. In re Busó Aboy, supra, pág. 66; In re Saavedra Serrano, supra, pág. 829. En In re Saavedra Serrano, supra, la conducta antiética imputada al licenciado Saavedra ocu-rrió mientras éste fungía como juez. Allí, la Oficina de Ad- *862 ministración de los Tribunales presentó una querella en la que se le imputó al licenciado Saavedra haber violado, inter alia, el Canon 9 de Etica Profesional, supra. Empero, la Comisión de Disciplina y de Separación del Servicio por Razón de Salud de Jueces del Tribunal de Primera Instan-cia y del Tribunal de Circuito de Apelaciones determinó que no hubo violación a dicho canon porque éste había sido diseñado para regir la conducta de los miembros de la pro-fesión legal en los tribunales y que, por lo tanto, no apli-caba a los jueces y a las juezas. Este Tribunal confirmó esa apreciación y sostuvo que el Canon 9 no le aplica a los jueces y las juezas; por ende, concluyó que las actuaciones del licenciado Saavedra no constituyeron violaciones al Canon. A igual conclusión llegó este Tribunal en In re Busó Aboy, supra.
Cabe destacar que este canon se ha aplicado en una amplia gama de situaciones. Así, por ejemplo, hemos deter-minado que la desatención de un abogado o abogada a las órdenes del Tribunal constituye una violación al Tribunal. In re Torres Viera, 179 D.P.R. 868 (2010); In re Dávila Toro, 179 D.P.R. 833 (2010). También hemos señalado que “ ‘[e]l abogado no tiene licencia absoluta en el uso del lenguaje para poner en entredicho o mancillar la dignidad de los jueces’ ”. In re López de Victoria I, 163 D.P.R. 1, 8 (2004). De la misma forma hemos afirmado que es nefasto para la buena práctica de la profesión que un abogado o abogada haga serias imputaciones sobre el obrar de un juez o de una jueza cuando las mismas no están avaladas por evi-dencia contundente e indubitada. Id.; In re Rochet Santoro, 174 D.P.R. 123 (2008); In re Crespo Enríquez, supra, pág. 663.
Resulta también ser una violación al Canon 9 del Có-digo de Ética Profesional, supra, que un abogado o abo-gada, durante la toma de deposición de su cliente, se com-porte de tal forma que no propicie un ambiente de solemnidad y decoro o que desobedezca las instrucciones que emita un juez o una jueza con relación a la forma en que se debe conducir la deposición. In re González Carras- *863 quillo, 164 D.P.R. 813 (2005). A su vez, conculca este prin-cipio el abogado o la abogada que, en lugar de utilizar ar-gumentos persuasivos para convencer al tribunal, recurra al uso de lenguaje soez para adelantar los intereses de su cliente. In re López de Victoria I, supra, pág. 8. Tampoco se ajusta al Canon 9 del Código de Ética Profesional, supra, aquel abogado o abogada que “observe una conducta irres-petuosa y poco profesional contra los empleados de la Rama Judicial, en asuntos relativos a la administración de la justicia ...”. In re Barreto Ríos, 157 D.P.R. 352, 357 (2002). Igualmente, viola este precepto el abogado o la abo-gada que se niegue injustificadamente a aceptar la desig-nación como abogado o abogada de oficio que le haga el Tribunal de Primera Instancia o que se niegue a proveerle su dirección al tribunal. In re Rodríguez Santiago, 157 D.P.R. 26, 36 (2002). También podría infringir este postu-lado el abogado o la abogada que se adentra en las oficinas de un juez o de una jueza sin haber recibido autorización para ello. In re Miranda Marchand, 135 D.P.R. 580, 589 (1994).
Como puede notarse, el Canon 9 del Código de Ética Profesional, supra, si bien se ha aplicado en múltiples con-textos, nunca se le ha aplicado a un juez o una jueza por una conducta irrespetuosa frente a los tribunales o a un abogado o abogada por sus actuaciones mientras ejercía como juez o jueza. No hemos encontrado ningún prece-dente en el cual eso haya sucedido. Su radio de alcance se ha limitado al comportamiento antiético de los abogados y las abogadas.
En el caso de autos, es un hecho incontrovertible que la conducta violatoria que se le imputa al querellado se llevó a cabo durante su incumbencia como Juez Superior del Tribunal de Primera Instancia de Puerto Rico. Esto es así ya que mientras fungía como juez Superior fue que el quere-llado dirigió una comunicación al Juez Presidente de este Foro, en la que cuestionó la imparcialidad de la Comisión de Evaluación. Por lo tanto, diferimos del Informe que so-metió la Comisionada Especial y concluimos, al igual que *864 lo hicimos en In re Busó Aboy, supra, y en In re Saavedra Serrano, supra, que el Canon 9 del Código de Etica Profe-sional, supra, no aplica a los jueces y a las juezas, y, por ende, tampoco aplica al querellado por las acciones que cometió cuando era juez.
V
Por otro lado, coincidimos con la Comisionada Especial en cuanto a que las actuaciones del querellado infringieron el Canon 38 del Código de Etica Profesional, supra. Éste, distinto al Canon 9, sí se ha aplicado a los abogados y a las abogadas por sus actuaciones mientras ejercían el cargo de juez y de jueza. Véanse: In re Campoamor Redín, supra, pág. 153; In re Suárez Marchán, supra, pág. 745; In re Scherrer Caillet-Bois, supra, pág. 869; In re Busó Aboy, supra, págs. 66-67. En lo pertinente, este canon dispone que:
El abogado deberá esforzarse al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su con-ducta como funcionario del tribunal, deberá interesarse en ha-cer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Canon 38 de del Código Ética Profesional, supra.
Este Tribunal ha señalado que este canon ex-tiende la obligación de los abogados de conducirse en forma digna y honrada a su vida privada. In re Quiñones Ayala, 165 D.P.R. 138, 145 (2005). Esto, debido a que "[1]a apariencia de conducta impropia puede resultar muy perniciosa con respeto de la ciudadanía hacia sus instituciones de justicia y a la confianza que los clientes depositan en sus abogados”. In re Ortiz Martínez, 161 D.P.R. 572, 588 (2004). En ese sentido hemos señalado que siendo los abogados y las abogadas el espejo donde se refleja la imagen de la profesión, deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que *865 ejercen. In re Silvagnoli Collazo, 154 D.P.R. 533, 541 (2001); In re Coll Pujols, 102 D.P.R. 313, 319 (1974). Por eso, “ ‘el abogado habrá de desempeñarse con dignidad y alto sentido del honor, aunque eso implique ciertos sacrifi-cios personales’ ”. In re Busó Aboy, supra, pág. 65. De ahí que “ ‘[l]a práctica de la abogacía, distinto quizás a otras profesiones, conlleva una seria y delicada función ciuda-dana pues la misma representa servicio, ética y ejemplo’ ”. In re Santiago Rodríguez, 160 D.P.R. 245, 254 (2003). Véase Ramos Acevedo v. Tribunal Superior, 133 D.P.R. 599, 613 (1993). En fin, los abogados y las abogadas —y, por consiguiente, los jueces y las juezas— deben traslucir en la praxis un sentido de justicia que sea inmaculado, no solamente en su realidad interior, sino también en su apa-riencia externa. Véase In re Rodríguez Torres, 104 D.P.R. 758, 766 (1976).
De acuerdo con lo anterior, estamos convencidos de que la carta que envió el querellado a distintos abogados y abo-gadas para que recomendaran su renominación o ascenso al Director de la Oficina de Nombramientos Judiciales en la Fortaleza, no sólo fue una gestión aparentemente impro-pia, sino que fue en realidad impropia. Como ya dijimos, la carta solicitaba a los abogados y abogadas que redactaran una carta de recomendación solamente si consideraban que el querellado se desempeñaba adecuadamente en la función judicial. Además, la misiva pedía a los abogados y a las abogadas que, de remitir la carta de recomendación, enviaran una copia al querellado. Como ya dijimos, tal ac-tuación colocó al querellado en una posición en que su im-parcialidad se podía cuestionar, porque la carta enviada daba la impresión de que los abogados y abogadas que no lo recomendaran no consideraban que el querellado se des-empeñaba adecuadamente. Más aún, la naturaleza de la petición, a nuestro entender, creó la apariencia de que el querellado quiso aprovecharse de su posición como juez para obtener un beneficio personal. Esto, sin duda, no es un buen ejemplo de responsabilidad ética.
*866 Asimismo, creemos que el lenguaje utilizado por el que-rellado en esa carta y en la que le envió al Juez Presidente, el 16 de julio de 2007, no fue el más apropiado. Allí, sin fundamento alguno, el querellado puso en duda la integri-dad y honestidad de los miembros de la Comisión de Evaluación.(2)
En síntesis, ni el haber enviado la carta a los abogados y abogadas para solicitarles que lo recomendaran, ni las ex-presiones vertidas por el querellado en esa misiva y en la que le dirigió al Juez Presidente, son actuaciones que exal-tan el honor y la dignidad de la profesión legal.
VI
Por último, debemos determinar qué sanción vamos a imponer al querellado. Para ello, es necesario hilvanar las circunstancias y los contornos de la casuística para equipa-rar, lo mejor posible, la sanción que le impongamos al que-rellado con las que les impusimos, en otros contextos, a otros abogados y abogadas.
Así, por ejemplo, en In re Vélez Collado, 159 D.P.R. 422 (2003), este Tribunal censuró enérgicamente al juez Vélez Collado luego de que éste emitiera una orden de desacato contra una parte y no contra su representante legal, a pe-sar de que fue por culpa de la ausencia del representante legal, y no de la parte, que se había suspendido el juicio en varias ocasiones, incluso la ausencia que motivó el *867 desacato. Las razones aducidas por dicho juez para así pro-ceder fueron las siguientes:
“La vez anterior este caso se suspendió porque también us-ted compareció sin representación legal. La verdad que la con-ducta, yo no sé si es imputable a usted o no, pero yo se la voy a imputar a usted, después usted se defiende. Este Tribunal le va a imponer una fianza de $20,000 por el delito de desacato y ordena su ingreso en la cárcel hasta tanto presente los $20,000. Cualquier otro asunto, resuélvalo con su abogado y le vamos a conseguir una fecha de señalamiento para esta vista. (Énfasis suplido.)” In re Vélez Collado, supra, pág. 424.
En ese caso, el perjudicado fue ingresado en la cárcel hasta que se le concedió una vista de rebaja de fianza en la que otro juez no solamente le rebajó la fianza, sino que autorizó a que se prestara el diez porciento (10%) de ésta, opción que el juez Vélez Collado le había negado a la parte perjudicada.
A su vez, en In re Pérez Rodríguez, 91 D.P.R. 219 (1964), este Tribunal censuró enérgicamente al juez Pérez Rodrí-guez luego de que éste le ordenara a la policía que arres-tara a una persona que le negó acceso a una actividad por-que el juez se negaba a pagar la entrada. Si bien es cierto que en ese caso no hubo consenso en torno a la sanción impuesta, la mayoría impuso a dicho juez una censura enérgica.
Un tercer ejemplo lo encontramos en In re Castro Colón, 155 D.P.R. 110 (2001). Allí, este Tribunal censuró enérgica-mente a la jueza Castro Colón por intervenir indebida-mente en un pleito de divorcio. En ese caso, César Méndez Otero, quien a su vez era el Alcalde del Municipio de Río Grande, pidió a la magistrada que interviniese con su es-posa, la señora García Rodríguez, para reglamentar las re-laciones entre ellos como parte del proceso de divorcio. La jueza accedió a tal petición y se comunicó con la señora García Rodríguez, y le pidió que pasara por su oficina para discutir lo relevante al caso de divorcio. La señora García Rodríguez acudió a la oficina de la magistrada y sometió una moción en la cual le pidió a ésta que terminara su *868 intervención en el caso entre ella y su esposo. Empero, y a pesar de haber declarado “con lugar” dicha moción, la jueza Castro Colón volvió a intervenir con el asunto en cuestión.
Ésta emitió una orden ex parte dirigida a la Policía de Puerto Rico para que acompañara al alcalde Méndez Otero hasta la residencia de la señora García Rodríguez, de ma-nera que éste pudiese recoger su ropa y otros documentos. La orden, además, apercibía a la señora García Rodríguez a no intervenir con el cumplimiento de dicha orden. Luego de que infructuosamente se tratara de llevar a cabo lo dis-puesto en la orden, porque la señora García Rodríguez no estaba en su casa, la jueza Castro Colón declaró a la señora García Rodríguez incursa en desacato civil y le impuso una multa de cien dólares ($100).
Cabe señalar que la Comisión de Evaluación, a la hora recomendar la sanción en dicho caso, tomó en considera-ción el hecho de que la jueza Castro Colón nunca antes había incurrido en falta y que la conducta de la magistrada no había resultado en beneficio para ella.
En In re Saavedra Serrano, supra, este Tribunal se li-mitó a censurar enérgicamente al Ledo. Luis G. Saavedra Serrano con un apercibimiento contra futuras infracciones. Ello se hizo porque se trataba de su primera ofensa. En ese caso, se concluyó que el licenciado Saavedra Serrano no se condujo en su sala de forma serena, imparcial y respetuosa con el querellante. Por eso, señalamos:
El licenciado Saavedra Serrano, desde el comienzo de la vista, actuó de forma hostil y descortés al dirigirse al querellante, y en varias ocasiones hizo alusión a su poder y autoridad para “meterl[o] preso”. Además, aun cuando el acusado querellante manifestó — en forma serena y respetuosa — ser una persona indigente y que carecía de representación legal, el querellado, de forma severa y abusiva, le advirtió que si no lo hacía “lo iba a lamentar”; le ordenó buscar representación legal sin hacer uso de su facultad para asignarle un abogado de oficio. Igual-mente, el licenciado Saavedra Serrano, aun cuando advirtió alguna condición mental o emocional de González Salas [querellante], no observó sensibilidad alguna y continuó diri-giéndose a éste de forma recia y despectiva, lo que ocasionó *869 que, finalmente, González Salas reaccionara en la forma en que lo hizo.
Resulta evidente que, con su proceder, el licenciado Saave-dra Serrano lo que hizo fue intimidar innecesariamente a un ciudadano humilde y afectado emocionalmente, lo cual deni-gra la profesión legal, promoviendo y ocasionando que este ciudadano reaccionara de la forma en que lo hizo y perdiera el control sobre su comportamiento. (Énfasis y escolios omitidos.) In re Saavedra Serrano, supra, págs. 830-831.
Como se puede apreciar, en los precedidos casos la san-ción que impuso este Tribunal consistió en la censura enérgica. Ello, a pesar de que las conductas allí ejemplifi-cadas y sancionadas eran tan o más ominosas que las ma-nifestadas por el querellado en el presente caso. De hecho, los excesos de los jueces en tales casos, distintos al de autos, tuvieron repercusiones negativas con terceras perso-nas, infringiéndole la libertad, imponiéndole sanciones eco-nómicas de manera injustificada o denigrando su dignidad con faltas de respeto y actitudes poco imparciales.
En el caso de autos, aunque las actuaciones del quere-llado iban dirigidas a intentar lograr su renominación o ascenso como juez por un nuevo término, éste no logró su propósito. Es decir, no logró obtener un beneficio propio. Asimismo, debemos destacar, como lo hace la Comisionada Especial en su Informe, que el querellado en veintiséis (26) años de práctica en la profesión no había cometido ninguna falta o conducta reñida con los cánones de ética profesional. A su vez, como ya discutimos, el Canon 9 del Código de Etica Profesional, supra, no le aplica al quere-llado en el contexto de este caso.
Por los fundamentos expuestos, la prudencia nos acon-seja a censurar enérgicamente al querellado con un aper-cibimiento sobre conducta similar en el futuro.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión disidente, a la cual se unieron el Juez Presi- *870 dente Señor Hernández Denton y la Jueza Asociada Se-ñora Fiol Matta.
Opinión disidente emitida por la Juez Asociada Señora Ro-dríguez Rodríguez, a la que se une el Juez Presidente Señor Hernández Denton y la Jueza Asociada Señora Fiol Matta.
El licenciado Eliseo Gaetán y Mejías (el querellado o el licenciado Gaetán y Mejías) fue admitido al ejercicio de la abogacía el 6 de junio de 1983. Doce años más tarde, el 18 de diciembre de 1995, juramentó como juez superior y ejer-ció su cargo en varias regiones judiciales. Durante los últi-mos cuatro años de su término estuvo asignado al Tribunal de Primera Instancia, Sala de Guaynabo. El 18 de diciem-bre de 2007, vencido ya su término, el Gobernador del Es-tado Libre Asociado de Puerto Rico le extendió un nombra-miento de receso al mismo cargo de juez superior. El licenciado Gaetán y Mejías fue asignado a ejercer como juez en la Región Judicial de Humacao. El Senado de Puerto Rico no consideró su nombramiento, por lo que cesó en su cargo el 30 de junio de 2008.
El licenciado Gaetán y Mejías fue objeto de una investi-gación que realizó la Oficina de Administración de los Tribunales (OAT), relacionada con ciertas actuaciones en torno al proceso de su renominación durante el 2007. Como resultado de la referida investigación, se rindió un informe de investigación en el cual se concluía que el licenciado Gaetán y Mejías incurrió en violaciones al Canon 29 de Ética Judicial, 4 L.P.R.A. Ap. IV-A, y a los Cánones 9 y 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Ello dio paso a que la conducta del licenciado Gaetán y Mejías se refiriera a la Comisión de Disciplina Judicial (Comisión de Disciplina) para la acción correspondiente.
La Comisión de Disciplina concluyó que, en efecto, el licenciado Gaetán y Mejías incurrió en las violaciones éti- *871 cas señaladas, por lo que se presentó la correspondiente querella y, luego de los trámites de rigor, se designó una Comisionada Especial para atenderla. Concluido este pro-ceso, la Comisionada Especial emitió su informe, el cual nos ha remitido. Nos corresponde en este momento aquila-tar dicho informe y evaluar la conducta del licenciado Gae-tán y Mejías.
Comenzamos nuestro análisis con un resumen detallado de los hechos que dan base a la querella presentada contra el licenciado Gaetán y Mejías.
I
Mientras el licenciado Gaetán y Mejías se desempeñaba como juez superior, y presto a vencer su nombramiento, éste solicitó ser renominado al cargo de juez del Tribunal de Primera Instancia o ascendido al Tribunal de Apelaciones. El 11 de abril de 2007, la Comisión de Eva-luación Judicial (Comisión de Evaluación o Comisión) llevó a cabo una evaluación del desempeño del querellado. Ésta emitió un informe, en el cual concluyó que el querellado no estaba calificado para renominación o para ascenso.
El 9 de mayo de 2007, el querellado se comunicó por escrito con la Comisión de Evaluación para expresar su disconformidad con los resultados de su evaluación y soli-citó una prórroga para recopilar aquella información nece-saria referente a sus cualificaciones como juez y rebatir la determinación de que no estaba calificado. La Comisión de Evaluación le concedió la prórroga solicitada y, además, le informó que tendría una segunda oportunidad para compa-recer ante sí y presentar sus objeciones al informe de eva-luación emitido. La comunicación que se le envió iba acom-pañada con un desglose de los comentarios negativos que recibió la Comisión de Evaluación sobre su desempeño como juez. Se indicaba también que no se le incluían aque-llos comentarios cuyo contenido permitiría que se identifi-cara al entrevistado. Se le solicitó, además, que presentara un escrito con un resumen de los fundamentos que esgri- *872 miría en su día ante la Comisión de Evaluación para refu-tar las conclusiones del informe.
Así las cosas, el 10 de mayo de 2007, el licenciado Gae-tán y Mejías suscribió una carta dirigida a abogados y abogadas. Por su importancia, transcribimos en su totali-dad la carta suscrita por el querellado:
FROM THE DESK OF ELISEO GAETAN MEJIAS SUPERIOR COURT JUDGE
“Invoke the imagination, Provoke the senses, Evoke the emotions, ... for creative thinking and knowledge.”
G. Laliberté E. Gaetán
Distinguido Letrado:
Nos dirigimos a usted porque estamos seguros de que no cree en que la maldad deba prevalecer sobre el bien ni la injusticia sobre la justicia.
Por lo anterior, si usted considera que nos hemos desempe-ñado adecuadamente en la función judicial, nos urge que tenga a bien en hacer una carta dirigida a:
Sr. Hugo Díaz-Director
Oficina de Nombramientos Judiciales
La Fortaleza, San Juan, P.R. 00901
Estando en la etapa final de evaluación para el Tribunal de Apelaciones, el Hon. Francisco Rebollo López, en su carácter de Presidente del Comité Evaluador, nos ha dado como no cua-lificados ni para el Tribunal de Apelaciones ni para renomina-ción al Tribunal Superior. Esto sin duda es una agenda de algún enemigo invisible que nos persigue desde Arecibo y que hasta ahora ha logrado que no sean justos en la evaluación. No tenemos otra forma de defendernos de esta infamia, toda vez que se nos negó tener acceso a los formularios de evalua-ción que tenían los abogados y fiscales consultados sobre el particular. Los renglones en que se nos ha indicado como no cualificados en escala del 1 al 6 son los siguientes:
1. Reputación intelectual No cualificado
2. Destrezas profesionales No cualificado
3. Destrezas de comunicación No cualificado
4. Temperamento judicial No cualificado
5. Calidad de labor No cualificado
6. Juicio valorativo No cualificado
Ante este atropello a la dignidad del ser humano, no nos queda *873 otro recurso que dirigirnos a usted para que nos apoye con el envío de una carta y que la misma nos sea entregada cerrada y una copia para nuestro récord, para solicitar una cita con el Sr. Hugo Díaz, de manera que podamos explicar con prueba que contradiga la errónea apreciación de la Comisión, quien dich[o] sea de paso, ninguno de sus componentes ha estado en nuestra Sala para palpar realmente el desempeño en la fun-ción judicial.
Con el testimonio de nuestro aprecio quedamos de usted.
Cordialmente,
Fdo. Eliseo Gaetán y Mejías. (Énfasis suprimido, nuestro y en el original.) Exhibit 1.
El 28 de junio de 2007, la Directora Administrativa de la OAT, luego de recibir copia de la carta antes transcrita, así como de una carta enviada por una abogada al señor Díaz, le envió una comunicación al licenciado Gaetán y Me-jías para informarle que se había iniciado una investiga-ción en su contra, habida cuenta de que dicha carta, de su faz, aparentaba estar en conflicto con el Canon 29 de Ética Judicial, supra. En la comunicación enviada, la Directora solicitó al querellado que cesara y desistiera de enviar este escrito para evitar que ello mancillara la imagen de la Rama Judicial, así como la del propio juez. Se le concedió un término de diez días para que se expresara sobre el contenido de la carta y se le informó que de no comparecer se continuaría con la investigación sin el beneficio de su comparecencia. La carta de la Directora venía acompañada con copia de los documentos que motivaron el inicio de la investigación.
El 16 de julio de 2007, el licenciado Gaetán y Mejías le envió una extensa comunicación al Juez Presidente del Tribunal Supremo, con copia a todos los. Jueces Asociados, en la cual objetaba la evaluación negativa que de él hizo la Comisión de Evaluación y solicitaba su reconsideración. Se anejó a dicha carta copia de sesenta cartas, firmadas por sesenta y seis abogados, que recomendaban su gestión judicial.
Indicó que declinaba comparecer ante la Comisión de Evaluación por segunda ocasión, conforme se le había oiré- *874 cido, por no “inspirarnos dicha Comisión ninguna con-fianza al darle credibilidad a meros comentarios y alega-ciones, que en ningún Tribunal hubieran sido admitidas”. Querella, Exhibit 6. Sostuvo que la Comisión de Evalua-ción, “en nuestro caso particular, no ha actuado en la forma justa, imparcial y diligente que requiere su delicada encomienda”. íd. Que la Comisión, “en forma totalmente contraria a su estatuto orgánico, nos ha negado el derecho a examinar los formularios que dan base a su aberrada evaluación ...”. Id. Además, apuntó que la Comisión llevó a cabo una evaluación “réproba” y “desastrosa”, y que las conclusiones a las que llegó son “totalmente sesgadas (biased) que no recogen en su contenido estocástico (aleatorio) la función judicial que hemos realizado”. Id.
Indicó que la reconsideración que solicitaba del Tribunal Supremo “requiere que sea realizada sin tomar en con-sideración el hecho de que el Juez que preside la Comisión lleva muchos años en ese Alto Foro, así como tampoco el esprit du corp que permea toda institución”. Querella, Exhibit 6. Aclaró que “no le deslumbran las candilejas ni las frivolidades, como el aparecer en la Internet en el Cuadro de Honor de Jueces Excelentes, en una foto oficial ni en algún certificado de reconocimiento”. Id. Y, por último, luego de expresar su tristeza y desasosiego por la evalua-ción recibida, apuntó que si tuviese que abandonar la Rama Judicial lo haría “con la frente en alto, con la satis-facción del deber excelsamente cumplido y, sobre todo, con el mal sabor de que los llamados por antonomasia a impar-tir justicia, y teniendo la oportunidad de hacerlo, no lo hi-cieron con uno de sus pares”. Id. Posteriormente, en agosto del mismo año, el licenciado Gaetán y Mejías le envió una nueva comunicación al Juez Presidente para indicar que había sido notificado de la querella que inició en su contra la OAT y solicitaba su desestimación. La comunicación aducía que el Canon 29 de Etica Judicial violaba el princi-pio de legalidad, pues no establecía penalidad alguna por su incumplimiento, y además adolecía de vaguedad al pro- *875 hibir gestiones “indebidas” sin establecer con claridad qué era lo indebido. Además, sostuvo que los Cánones de Ética Judicial de 2005 violaban la igual protección de las leyes, pues no aplicaban a los miembros del Tribunal Supremo, lo que constituía “una clasificación sospechosa de discrimen por condición social”. íd. Posteriormente, este Tribunal de-claró “no ha lugar” la solicitud de desestimación de la querella. (1)
Así las cosas, y como parte de la investigación que lle-vaba a cabo la OAT, sus investigadores tomaron un sinnú-mero de declaraciones juradas a distintos abogados que ha-bían suscrito cartas para recomendar al querellado. De estas declaraciones juradas surge que las cartas de reco-mendación se remitieron tanto en fechas anteriores y pos-teriores a la comunicación que el querellado recibiera de parte de la Directora Administrativa de la OAT en la cual le solicitaba que desistiera de dicha práctica. Algunos de los que suscribieron cartas de recomendación lo hicieron luego de que el querellado les llamara personalmente o los visitara en sus oficinas privadas para solicitarles que en-viaran las cartas; otros, recibieron por correo o facsímil la comunicación por escrito del querellado y accedieron a en-viar la recomendación solicitada. Algunos abogados, sin embargo, se enteraron del proceso de renominación por compañeros abogados y decidieron suscribir sus cartas de recomendación. Todos indicaron que le entregaron copia de la carta de recomendación que enviaron al querellado, al-gunos personalmente y otros las remitieron por correo. Los abogados entrevistados aseguraron que era la primera vez *876 que recibían una comunicación o solicitud de tal naturaleza.(2)
El 13 de noviembre de 2008 la OAT emitió su informe de investigación. El informe concluyó que las actuaciones del licenciado Gaetán y Mejías vulneraron el Canon 29 de Ética Judicial, así como los Cánones 9 y 38 del Código de Ética Profesional, supra. El informe recomendó que se re-firiera el asunto a la Comisión de Disciplina para la corres-pondiente querella.
Recibido el informe de investigación, la Comisión de Disciplina determinó causa y dispuso para que se presen-tara la querella correspondiente. El 16 de enero de 2009 este Tribunal designó a la licenciada Crisanta González Seda como Comisionada Especial para que recibiera la prueba en este caso y emitiera, a su vez, un informe. Pos-teriormente, referimos la querella a la Oficina del Procu-rador General para que compareciera como parte quere-llante en los procedimientos que se habrían de iniciar conforme se dispone en la Regla 14 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A.
El 13 de marzo de 2009, el licenciado Gaetán y Mejías compareció y contestó la querella presentada. En su con-testación, el querellado solicitó la desestimación de la que-rella por considerar que la conducta que se le imputaba ocurrió mientras él se desempeñaba como juez y los cáno-nes de ética profesional rigen la conducta de los abogados, pero no de los jueces en funciones. Además, sostuvo que las cartas que él envió no pueden catalogarse como contrarias a los Cánones 9 y 38 del Código de Ética Profesional, supra. Adujo también que no procedía concluir que había incumplido el Canon 29 de Ética Judicial, pues al momento *877 de emitirse el informe de investigación ya él no fungía como juez y, aim asumiendo para propósitos de argumen-tación que el contenido de las cartas fuese contrario a los cánones que se le imputaban, ya él había sido sancionado, pues al extendérsele un nombramiento de receso en diciembre de 2007 fue asignado a la Región Judicial de Humacao.
Luego de varios incidentes procesales, el caso quedó so-metido —por el expediente— para que la Comisionada Especial resolviera. El 17 de diciembre de 2009 ésta emitió su informe, el cual nos remitió. En éste concluyó que la con-ducta del licenciado Gaetán y Mejías estaba reñida con el Canon 29 de Etica Judicial por lo que se configuró una violación de los Cánones 9 y 38 del Código de Ética Profesional. El licenciado Gaetán y Mejías no ha replicado al informe de la Comisionada, como tampoco ha solicitado un término para ello. Como resultado, el asunto quedó so-metido ante nuestra consideración para su resolución, por lo que pasamos a atenderlo.
¡-H i — I
Como asunto de umbral tenemos que expresarnos con relación al argumento dual del querellado de que no tene-mos jurisdicción para sancionarle, bien porque los cánones de ética profesional no aplican a los jueces en funciones o bien porque la conducta imputada acaeció mientras él era juez, y toda vez que ya no se desempeña como tal, no cabe encontrarlo incurso en una violación a los cánones de ética judicial.
Como sabemos, la jurisdicción disciplinaria del Tribunal Supremo sobre los jueces del Tribunal de Primera Instan-cia, así como del Tribunal de Apelaciones, emana del Art. V, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Precisamente, de acuerdo con ese mandato constitucional aprobamos los Cánones de *878 Ética Judicial de 2005, en los que se establecen las normas mínimas de conducta exigibles a los miembros de la Judicatura. 4 L.P.R.A. Ap. IV-B. Véase, además, In re Cruz Aponte, 159 D.P.R. 170 (2003).
Las Reglas de Disciplina Judicial, 4 L.P.R.A. Ap. XV-B, por su parte, delinean el esquema procesal que se utiliza para tramitar los asuntos disciplinarios instados contra miembros de la Judicatura. Así, la Regla 33(a), sobre el efecto de la renuncia o expiración del término de nombra-miento, dispone claramente que: “La renuncia o la expira-ción del término del nombramiento de la jueza o del juez querellado no impedirá que continúe el procedimiento dis-ciplinario en su contra al amparo de este reglamento. La Comisión determinará si la conducta amerita la recomen-dación de imponerle a la jueza o al juez querellado medidas disciplinarias por violación al Código de Ética Profesional.”
Los argumentos que esgrimió el querellado ya este Tribunal los ha resuelto contra esa posición. Hace ya casi cin-cuenta años decidimos que la “conducta impropia ... obser-vada por un juez puede dar lugar a su desaforo o suspensión como abogado, aun cuando hubiese cesado como magistrado”. In re Liceaga, 82 D.P.R. 252, 257 (1961). Años más tarde, en In re Campoamor Redín, 150 D.P.R. 138, 149 (2000), aclaramos que a tenor con nuestro poder inherente para disciplinar y destituir jueces, “el cese en el desempeño de las funciones como juez, ya sea por motivo de renuncia, por la no renominación o por la separación del cargo, no es óbice para que continúe el procedimiento dis-ciplinario, si la naturaleza de la conducta imputada puede dar lugar al desaforo, a la suspensión de la abogacía o a otras medidas disciplinarias”. Y en In re Suárez Marchán, 159 D.P.R. 724, 734-735 (2003), señalamos que el cese en funciones de un juez no “es óbice para que ejerzamos nues-tro poder inherente para disciplinar [le] en caso de que su conducta como juez haya infringido los Cánones de Ética Judicial, y que esas actuaciones también violen los cánones del Código de Ética Profesional”.
*879 Vemos entonces que, ya bien por virtud de nuestro po-der inherente para disciplinar a los jueces o bien por lo dispuesto expresamente en la Regla 33(a) de Disciplina Judicial, el hecho de que un juez no ocupe su cargo no es obstáculo para que pasemos juicio sobre sus actuaciones mientras fungía como tal y concluyamos, cuando los hechos lo ameriten, que se ha incurrido en conducta que contra-viene los cánones de ética profesional. Y es que así debe ser. De lo contrario, quedaría inerme la defensa adecuada de la justicia pues una querella podría tornarse académica ante el cese en funciones del juez. Además, sería igual-mente contrario e “incompatible con nuestra facultad inhe-rente para reglamentar el ejercicio de la abogacía”. In re Scherrer Caillet-Bois, 162 D.P.R. 842, 859 (2004).
Despejado el planteamiento de umbral, pasamos a eva-luar el estado de derecho vigente respecto a los cargos que se le imputaron al licenciado Gaetán y Mejías.
III
Todo abogado “tiene un deber ineludible de proteger y fortalecer la independencia judicial”. S. Steidel Figueroa, Etica y responsabilidad disciplinaria del abogado, San Juan, Pubs. J.T.S., 2010, pág. 312. En su multiplicidad de facetas, la independencia judicial es presupuesto indispensable para nuestra vida en democracia. Este valor sirve de telón de fondo al impartirle contenido ético al Canon 9 del Código de Etica Profesional. íbid.
El Canon 9 del Código de Ética Profesional dispone, en lo pertinente, que todo abogado “debe observar para con los tribunales una conducta que se caracterice por el mayor respeto. Ello incluye la obligación de desalentar y evitar ataques injustificados o atentados ilícitos contra los jueces o contra el buen orden de la administración de la justicia en los tribunales”. 4 L.P.R.A. Ap. IX.
En el pasado hemos expresado que “el abogado no tiene licencia absoluta en el uso del lenguaje para poner en en- *880 tredicho o mancillar la dignidad de los jueces. En este sen-tido, recurrir constantemente al “apuntamiento de que el tribunal actuó ‘con peijuicio, pasión y parcialidad’, sin sus-tanciarlo o sin motivos fundados para así creerlo, es un comportamiento censurable que [se debe] rechazar”. In re Cardona Álvarez, supra, pág. 907. Es contrario a la buena práctica de la profesión que un abogado haga serias impu-taciones sobre el obrar de un juez cuando dichas imputa-ciones no se sostienen con evidencia contundente e indubitada. In re Crespo Enriquez, 147 D.P.R. 656 (1999).
El Canon 9 del Código de Ética Profesional exige, por un lado, respetar las órdenes y directrices que emitan los jue-ces; por otro lado, impone a todo abogado “el deber de res-petar a jueces, empleados y funcionarios del tribunal, tanto en comparecencias formales, personales o por escrito, como cuando interactúa informalmente con éstos (respeto de ca-rácter cívico)”. Steidel Figueroa, op. cit. Hoy nos ocupa esta segunda vertiente.
Cuando evaluamos las expresiones de un abogado según el crisol del Canon 9, debemos distinguir, como correcta-mente señala el juez Steidel Figueroa en su obra, “entre expresiones con contenido ético y disciplinariamente obje-tables y expresiones cuyo carácter objetable reside en la forma en que se formulan, independientemente de su contenido”. Steidel Figueroa, op. cit., pág. 315. Son expre-siones objetables por su contenido aquellas que “están aso-ciadas a imputaciones falsas y no fundamentadas contra jueces u otros funcionarios del tribunal, como acusar sin motivos fundados a un juez de que ha actuado ‘con prejui-cio, pasión y parcialidad’ ”. íbid. Véase In re Cardona Álvarez, supra, pág. 907.
No hay duda que siempre cabe una crítica razonada y razonable a las determinaciones judiciales. Tan es así que hemos considerado que la crítica judicial sana y oportuna se revela indispensable para la buena marcha judicial pues mantiene a los jueces “alertas y atentos al estricto cumpli-miento de sus funciones”. In re Andréu Ribas, 81 D.P.R. 90, *881 120 (1959). Además, y como hemos indicado en el pasado, no se puede sostener que los cánones de ética profesional puedan considerarse como fuente de censura a los abogados. In re Rodríguez Rivera, 170 D.P.R. 863 (2007). Antes bien, debemos recalcar que el hecho de que un abo-gado defienda apasionada y diligentemente la causa de su cliente no es incompatible con la exigencia de que cuando lo haga, sea de una forma decorosa y respetuosa. No hay nada que propenda más a destruir el justo balance de la conciencia judicial y a deteriorar y obstaculizar la impar-cialidad y el recto y libre curso de la justicia que una crítica falsa, injustificada y viciosa. Véase In re Andréu Ribas, supra.
Para guiarnos en la delicada faena de examinar y pon-derar la conducta de un abogado según el prisma del Canon 9, hemos elaborado ciertos criterios que nos guían en este cometido. Son éstos: primero, si aunque equivocado, el abogado creía en la validez de la imputación hecha al juez; segundo, si aun cuando los hechos no eran ciertos, tenía motivos fundados o causa probable para creer en su vera-cidad, y tercero, si la imputación no fue hecha maliciosa-mente con el propósito deliberado de denigrar al tribunal. Véanse: In re Crespo Enriquez, supra; In re Cardona Álvarez, supra; In re Martínez, Jr, 108 D.P.R. 158 (1978); In re Andréu Ribas, supra. Cuando las expresiones que evalua-mos minan, o tienden a minar, la independencia judicial como valor que subyace el Canon 9, debemos evaluarlas con particular rigor. Es según estos principios que debería-mos considerar las actuaciones del ex juez Gaetán y Mejías.
Ello, no obstante, la mayoría rehúsa considerar las ex-presiones del ex juez Gaetán según el Canon 9 del Código de Etica Profesional. La mayoría considera que este pre-cepto ético sólo limita la conducta del abogado que litiga en los tribunales, por lo que concluye que el “deber impuesto es exclusivo a los abogados”. Específicamente, la mayoría sostiene que “este precepto está dirigido a regular la con- *882 ducta del abogado litigante en corte”. Y como este caso versa sobre las expresiones de un juez, se impone la con-clusión de que no aplica el canon al querellado.
La mayoría encuentra apoyo para su conclusión en nuestras expresiones en In re Buso Aboy, 166 D.P.R. 49 (2005); In re Saavedra Serrano, 165 D.P.R. 817 (2005), donde, en efecto, hicimos un señalamiento concluyente y sin elaborar, como lo expresado por la mayoría. Lo cierto es que en ninguno de esos casos evaluábamos las expresiones de un juez con las que cuestionaba la honradez de otro juez; por el contrario, las expresiones objetables las había expresado un abogado. Los hechos que nos conciernen hoy son claramente distinguibles de lo ocurrido en estos casos, por lo que, en correcta técnica adjudicativa, nada de lo dis-puesto en In re Busó Aboy, ante, o en In re Saavedra Serrano, ante, nos impide que evaluemos si las expresiones del ex juez Gaetán y Mejías contra el Juez Asociado Señor Rebollo López constituyen una violación al Canon 9 del Código de Etica Profesional. Ninguno de estos casos visua-lizaba un escenario en donde un abogado-juez lanzaría un ataque contra otro juez de tal intensidad que lacera la in-tegridad de los tribunales. Además, y tal vez más impor-tante, en estos casos no consideramos la responsabilidad del abogado como funcionario al servicio de la Justicia, de actuar de forma tal que proteja y salvaguarde la indepen-dencia judicial. Para resumir, aplicar fuera de contexto nuestras expresiones en los casos antes mencionados, como hace la mayoría, obstaculiza un análisis necesario sobre la interacción del Canon 9 con los hechos como los de este caso.
Por otro lado, el Canon 38 del Código de Etica Profesio-nal dispone que: “El abogado deberá esforzarse al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios per-sonales y debe evitar hasta la apariencia de conducta pro-fesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal *883 aportación hacia la consecución de una mejor administra-ción de la justicia.”
Este canon extiende a la vida privada de los abogados la obligación de conducirse en forma digna y honrada. In re Quiñones Ayala, 165 D.P.R. 138 (2005). En ese sentido, cada abogado es un espejo en que “se refleja la imagen de la profesión, éstos deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen”. Ibid., pág. 145. Por ello, el “abogado habrá de desempeñarse con dignidad y alto sentido del honor, aun-que eso implique ciertos sacrificios personales”. íbid.
Por último, debemos enmarcar la conducta del licen-ciado Gaetán y Mejías con la que se espera de cualquier magistrado en nuestra sociedad. Para ello, debemos consi-derar lo dispuesto en los Cánones de Etica Judicial de 2005, ya que aquí se encuentran las normas mínimas de conducta exigibles a los miembros de la Judicatura puertorriqueña. Uno de los principios rectores de estos cá-nones es procurar que los jueces aporten siempre a la exal-tación de nuestra Judicatura, evitando trastocar o manci-llar el prestigio de la Rama Judicial. De esta forma se estimula el respeto y la confianza en la Judicatura. Ya he-mos señalado que debido a la naturaleza de las funciones del juez, se le exige una conducta ejemplar en todo mo-mento, dentro y fuera del tribunal. Véase In re Claverol Siaca, 175 D.P.R. 177 (2009). Se espera que los jueces sean ejemplo de sobriedad, respeto y urbanidad, incluso frente a personas irrespetuosas, y éstos deben evitar, en todo mo-mento, cualquier ejercicio inapropiado de su autoridad.
Por su parte, el Canon 29 de Ética Judicial establece que “[l]as juezas y los jueces se abstendrán de realizar ges-tiones indebidas para lograr ascensos o para obtener una renominación en la Judicatura. También se abstendrán de realizar gestiones indebidas para obtener cualquier otro cargo público”. Esta prohibición incluye todo tipo de ges-tión indebida tanto para beneficio del juez como de terce-ras personas, pero excluye los trámites oficiales ante los *884 organismos que tienen tangencia en el proceso de nombra-mientos judiciales.
Con estos principios en mente, pasemos a evaluar la controversia traída a nuestra consideración.
<1
Los hechos en este caso nos invitan a reflexionar acerca de la figura del juez y su rol en nuestra sociedad, y sobre la conducta que de éste esperamos. En esta faena tenemos, por necesidad, que partir de la premisa de que la indepen-dencia judicial es crítica para mantener el estado de derecho. Un Poder Judicial independiente proporciona equilibrio en el desempeño de los poderes públicos, al revi-sar la autoridad de los otros poderes del Estado para evitar la acción arbitraria del Gobierno. Concomitante natural a la independencia judicial es, naturalmente, el ejercicio res-ponsable del Poder Judicial. Es decir, esa independencia para hacer cumplir la ley debe estar templada con el más alto grado de imparcialidad e integridad.
Juzgar es más que un trabajo, es una forma de vida. Cada juez se debe desempeñar con integridad, humildad, mesura y entereza de carácter, al igual que con un alto sentido de la relevancia social del cargo que ocupa. Como hemos dicho antes, existen unas profesiones que no admi-ten término medio y ésta es una de ellas. In re Nevárez Zavala, 123 D.P.R. 511, 524 (1989). Así, la función judicial requiere que “el juez conserve la rectitud de su conducta dentro y fuera del tribunal”, pues es de esta forma que mejor se salvaguarda la confianza pública depositada en su persona. In re Cruz Aponte, 159 D.P.R. 170, 186 (2003). Los jueces y los abogados comparten la responsabilidad “de preservar la dignidad de los procedimientos judiciales me-diante la observación de normas de urbanidad y respeto mutuo que propendan a evitar cualquier lesión a la solem-nidad que requiere la administración de la justicia”. Ibid.
*885 Los jueces no deben ejercer inapropiadamente la auto-ridad que la Constitución y las leyes les confiere, y deben evitar cualquier actuación que suponga una influencia in-debida en el ánimo de cualquier funcionario público, o del ciudadano que adviene en contacto con su persona. Los magistrados son los depositarios de la confianza del ciuda-dano en la administración de la justicia, por lo que sobre sus hombros recae la responsabilidad de no defraudar o faltar a esa confianza depositada. Esta confianza, a su vez, es presupuesto indispensable para la estabilidad y super-vivencia del estado de derecho. Esta confianza no es sólo el producto de un desempeño judicial que refleje aquello que prescribe el Derecho sino, también, es reflejo “de la con-ducta ejemplar de los jueces en su vida privada”. S. Steidel, La regulación de las actividades extrajudiciales de los jue-ces en Puerto Rico y en Estados Unidos, Suprema Corte de Justicia de la Nación, Serie Ética Judicial, México, 2007, pág. 14. Aharon Barak ha apuntado correctamente: “An essential condition for realizing the judicial role is public confidence in the judge. This means confidence in judicial independence, fairness, and impartiality. It means public confidence in the ethical standards of the judge. It means public confidence that judges are not interested parties to the legal struggle and that they are not fighting for their own power but to protect the constitution and democracy.” (Escolios omitidos.) A. Barak, The Judge in a Democracy, Nueva Jersey, Princeton University Press, 2006, pág. 109.
El prestigio del juez y de la institución que representa no debe utilizarse para gestionar privilegios o concesiones que de otro modo no se hubieran obtenido. La estimación en el cargo y la reputación bien ganada sólo pueden ser carta de presentación en el ejercicio de las funciones judiciales. De ahí la importancia de la prudencia en el ma-nejo de asuntos ajenos a la función judicial para evitar así la apariencia de que se utiliza la respetabilidad del puesto que se ocupa como instrumento de intimidación o para que se le favorezca en lo que son reclamos personales. Véase In *886 re Scherrer Caillet-Bois, supra. En el ámbito de la ética judicial, la prudencia es el valor orientado al autocontrol del poder de decisión de los jueces y al cabal cumplimiento con su función jurisdiccional. El juez prudente es aquel “que procura que sus comportamientos, actitudes y decisio-nes sean el resultado de un juicio justificado racional-mente, luego de haber meditado y valorado argumentos y contraargumentos disponibles ...”. Art. 69 del Código Mo-delo Iberoamericano de Etica Judicial. El juicio prudente exige del juez capacidad de comprensión y que se esfuerce por ser objetivo. Ya lo advertía Aristóteles: “El rasgo distin-tivo del hombre prudente es el ser capaz de deliberar y de juzgar de una manera conveniente sobre las cosas.”
V
Al analizar detenidamente los hechos que dieron base a esta querella, debemos concluir, al igual que la Comisio-nada Especial, que las actuaciones del querellado se apar-taron del mandato contenido en el Canon 29 del Código de Etica Judicial y ello, como señaló la Comisionada Especial en su informe, “tienen implicaciones que trascienden las responsabilidades del querellado, como juez, y se proyectan en su carácter personal y en su vida profesional como abo-gado”, por lo que se configuraron también violaciones a los Cánones 9 y 38 del Código de Etica Profesional. Informe de la Comisionada Especial, pág. 27.
A. La carta que el querellado envió a un sinnúmero de abogados para que éstos, a su vez, enviasen cartas al Director de la Oficina de Nombramientos Judiciales en La Fortaleza para recomendar su renominación o para un as-censo, y que le remitiesen copia de la carta enviada, no es, ni puede ser, una gestión legítima en el proceso de realizar una solicitud formal para tal renominación o ascenso. Como tampoco es o se puede considerar parte de los trámi-tes necesarios ante los organismos que asesoran al Poder *887 Ejecutivo o al Legislativo en dicha gestión. No hay duda de que, como poco, esta actuación es éticamente imprudente y “viola el espíritu de principios rectores de los Cánones de Etica Judicial”, tal y como concluye la Comisionada Especial en su informe.
La carta en cuestión, como vimos, se redactó en un pa-pel timbrado en cuyo encabezamiento aparecía el nombre del querellado y se le identificaba como “Juez Superior”. Le solicitaba a los abogados, con carácter de urgencia, que re-dactaran una carta solamente si consideraban que el que-rellado se desempeñaba adecuadamente en la función judicial y que, remitida la carta, le enviasen copia de ésta para su récord. Esta petición sin precedente crea la apariencia de que se utiliza el poder del cargo que se ocupe para be-neficio propio, lo que mina la confianza en nuestra Judicatura. No podemos perder de vista que algunas de las peticiones las hizo el querellado directamente al llamar por teléfono varios abogados o al visitarlos personalmente a sus oficinas. Lo que redunda en una presión mayor sobre quienes recibieron la petición directamente.
El querellado se colocó a sí mismo, al igual que a la Judicatura en general, en una posición insostenible, donde su imparcialidad podía, razonablemente, ser cuestionada. La carta que envió a los abogados que postulaban ante él daba la impresión de que el abogado que no enviase una carta de recomendación no consideraba que él, en su cali-dad de juez, se desempeñaba adecuadamente. No es irra-zonable pensar que el abogado que recibiera esta solicitud considerara que de no enviar la carta solicitada se podían perjudicar los asuntos que tuviese ante la consideración del juez. La sombra de sospecha que esta actuación arroja sobre la función judicial es funesta. Esta conducta del que-rellado no es cónsona con aquella que esperamos del juez ideal en nuestra sociedad. Del juez que nos inspira con-fianza, certidumbre, entereza, neutralidad e imparciali-dad, fidelidad a la ley, esperanza y admiración. Su proce-der está claramente reñido no sólo con el texto claro del *888 Canon 29 de Ética Judicial, sino con la esencia misma que fundamenta el Código de Ética Judicial. Su conducta hu-biese dado base suficiente para separarle del cargo de juez si éste lo estuviese ejerciendo. Aun cuando no procede san-cionarle por la violación bajo el Código de Ética Judicial, ello no es óbice para considerar si sus acciones son contra-rias a los cánones de ética profesional.
B. En la carta, el querellado hace expresiones ofensi-vas hacia su proceso de evaluación y arroja dudas sobre la integridad y honestidad de los miembros de la Comisión de Evaluación. Ello, al referirse a la evaluación que llevó a cabo por la Comisión como un acto de maldad e injusticia, que es una infamia y un atropello, y que es producto de una agenda en su contra de algún “enemigo invisible que lo persigue desde Arecibo y que hasta ahora ha logrado que no sean justos” con él. Querella, Exhibit 1. Indica, falsa-mente, que le negaron acceso a los formularios de evalua-ción que envían los abogados y fiscales consultados por la Comisión en todo proceso de evaluación, lo que constituye un atropello a su dignidad como ser humano.
Estas imputaciones las repite en la carta que le diri-giera al Juez Presidente objetando el informe emitido por la Comisión y atacando duramente a sus miembros y a su Presidente, el entonces Juez Asociado Señor Rebollo López. Indicó que éstos fueron insensibles y desconsiderados, que llevaron a cabo la evaluación de forma precipitada y tra-tándolo como “una cosa u objeto”. Querella, Exhibit 4. Ca-lificó el trato recibido como “en forma abyecta ya a base de anonimatos de personas interesadas en hacerle daño” y que las conclusiones del informe estaban “sesgadas”. Id. En la carta enviada al Juez Presidente el 16 de julio de 2007, no hay evidencia de que el querellado tuviera moti-vos fundados, más allá de sus alegaciones, para cuestionar la honradez e integridad de los miembros de la Comisión. Lo cierto es, como se indicó, que la Comisión le ofreció una oportunidad al querellado para que compareciera nueva-mente ante ésta y expresara su inconformidad y aportara *889 los fundamentos necesarios para demostrar la incorrección del informe rendido. Éste, no obstante, rechazó esta opor-tunidad bajo el fundamento de que no “confiaba” en la Comisión.
Cabe destacar que la Comisión de Evaluación Judicial es un organismo de la Rama Judicial creado por ley y pre-sidido por un miembro del Tribunal Supremo. Está com-puesto, además, por jueces, abogados en la práctica pri-vada y ciudadanos no abogados. Sus orígenes datan de 1988 cuando este Tribunal creó un sistema interno de eva-luación al cual, posteriormente, la Asamblea Legislativa le impartió carácter de ley. Véase Ley Núm. 91 de 5 de diciembre de 1991, según enmendada, 4 L.RR.A. secs. 71-74.
La Comisión es el organismo interno de la Rama Judicial para evaluar el desempeño de los jueces. Sus resulta-dos los utiliza internamente la Rama para beneficio de sus miembros pero, además, por disposición de ley, se compar-ten con la Rama Ejecutiva y Legislativa cuando éstas se encuentran en el proceso de atender peticiones de renomi-nación o ascenso de jueces. 4 L.P.R.A. secs. 73j y 73Z.(3)
Como todo sistema de evaluación del desempeño, el pro-ceso que ha diseñado la Comisión está dirigido a establecer un mecanismo sistemático, periódico y objetivo de estima-ción cualitativa y cuantitativa de la labor y eficacia del trabajo de los jueces. Su propósito no es sólo mejorar la calidad de la justicia impartida en los tribunales del Es-tado Libre Asociado de Puerto Rico, lo que de suyo sería suficiente para valorar su trabajo. Hay que destacar, tam-bién, que los mecanismos de evaluación del desempeño im-plantados a través de la Comisión constituyen parte del entramado amplio de medidas cuyo diseño persigue forta-lecer la independencia judicial. Al procurar el correcto des-empeño de los jueces mediante la evaluación objetiva de *890 sus ejecutorias, se busca evitar que incurran en excesos, los cuales, como sabemos, afectan desfavorablemente la imagen del Sistema Judicial.
Por otro lado, la transparencia e imparcialidad del sis-tema establecido garantiza que las evaluaciones se lleven a cabo al margen de cualquier criterio disonante, no jurídico y exógeno a la equilibrada impartición de la justicia. Es en este contexto que debemos justipreciar la labor que lleva a cabo la Comisión, evitando intentos de mancillarla o des-virtuar lo que ha sido hasta hoy su función. Véanse, entre otros: S.D. O’Connor, Judicial Accountability Must Safeguard, Not Threaten, Judicial Independence: An Introduction, 66 Denv. U.L. Rev. 1, 2 (2008); B. Fein y B. Neuborne, Why Should We Care About Independent and Accountable Judges, 84 Judicature 58, 59 (2000); D. Brody, The use of Judicial Performance Evaluation to Enhance Judicial Accountability, Judicial Independence, and Public Trust, 86 Denv. U.L. Rev. 115, 119 (2008); S. Anderson, Judicial Retention Evaluation Programs, 34 Loy. L.A. L. Rev. 1375, 1380 (2001); R. Kourliz y J. Singer, Using Judicial Performance Evaluaitons to Promote Judicial Accountability, 90 Judicature 200, 201 (2007).
Como se observa, el trabajo que desempeña la Comisión es, por demás, valioso; es garantía de eficiencia, calidad e imparcialidad del servicio público de la justicia. Por un lado, provee información objetiva y esencial sobre los jue-ces que van a ser renominados o ascendidos a los poderes públicos encargados de sus renominaciones o ascensos. Además, es un vehículo vital de retroalimentación sobre el desempeño profesional de los miembros de la Judicatura. Kourlis y Singer, supra, pág. 203 (“Judges themselves stand to benefit from the formal feedback of an evaluation. Each evaluated judge receives concrete information about the strengths and weakness of his or her performance, creating individualized opportunities for professional self-improvement”). Todo ello, como dijimos previamente, cons-tituye un mecanismo más de fortalecimiento del Sistema Judicial de nuestro país.
*891 Por todo lo anterior, no nos parece legítimo cuestionar, sin ápice de prueba para ello, la integridad e imparcialidad de los miembros de la Comisión. Como mínimo, las expre-siones del licenciado Gaetán y Mejías socavan las relacio-nes cordiales y el ambiente de civismo y profesionalismo que debe prevalecer en todo procedimiento judicial. Pero más grave aún, su actuación mina la confianza en uno de los organismos del Sistema Judicial cuyo fin es promover y garantizar la independencia judicial.(4) Sobre este particular, la Juez Asociada O’Connor ha indicado con gran atino, lo siguiente, y citamos extensamente:
Judicial independence has both individual and institutional aspects. As for individual judges, there are at least two avenues for securing that independence: First, judges must be protected from the threat of reprisals, so that fear does not direct their decision-making. Second, the method by which judges are selected, and the ethical principles imposed upon them, must be constructed so as to minimize the risk of corruption and outside influence. The first endeavor is to protect judicial independence from outside threats. The second is to ensure that judicial authority is not abuse, and it is the core concern of the enterprise of judicial accountability .... True judicial accountability advances judicial independence and the paramount Rule of Law. “Accountability and independence are two sides of the same coin: accountability ensures that judges perform their constitutional role, and judicial independence protects judges from the pressures that would pull them out of *892 that role”. ... A third value may be advanced through judicial accountability properly construed: judicial competence. A fundamental value of the Rule of Law is that judicial decisions are not made arbitrarily, but through a process of reasoned decision making. The Rule of Law therefore requires that “official decisions be justified in law, and therefore be reasoned and nonarbitrary with respect to general legal standards.” (Enfasis nuestro.) O’Connor, supra, págs. 2-4.
Como se detalló anteriormente, el ex juez Gaetán y Me-jías hizo serias imputaciones, de forma reiterada, contra el ex Juez Asociado Señor Rebollo López en las que cuestionó, sin base, su integridad y honestidad. Las expresiones iban dirigidas a impugnar las actuaciones del Juez Asociado Se-ñor Rebollo López mientras se desempeñaba como Presi-dente de la Comisión de Evaluación de Nombramientos Ju-diciales y evaluaba al entonces juez. La gestión de la Comisión y sus miembros sirve para garantizar la indepen-dencia del Poder Judicial. El cuestionamiento gratuito de la imparcialidad del Juez Asociado Señor Rebollo López, y por ende de la Comisión, socava las bases de esa indepen-dencia judicial que todo abogado debe resguardar. Y como ya apuntamos, es obligación de quien se desempeña en esta profesión proteger y promover la independencia judicial; exigencia que encuentra apoyo, ente otros mandatos éticos, en el Canon 9 del Código de Etica Profesional, supra.
De otra parte, en ninguna etapa de estos procedimientos el querellado ha sustentado ninguna de sus imputaciones, como tampoco ha demostrado que tenía motivos fundados para considerar veraz lo aseverado.
No actúa de forma digna y honorable, como tampoco con el mayor respeto, ni exalta el honor y la dignidad de su profesión el abogado que así procede y así se expresa. Como vimos, el Canon 9 del Código de Etica Profesional impone a los miembros de la clase togada la obligación de observar para con los tribunales y los miembros de la Ju-dicatura una conducta que se caracterice por el mayor res-peto y, aun cuando se critique válidamente, se haga con mesura y deferencia. También el Canon 38 exige del abo- *893 gado, entre otras cosas, aportar con su conducta a la mejor administración de la justicia evitando, entre otras cosas, la mera apariencia de conducta impropia. No albergamos duda alguna de que la conducta del licenciado Gaetán y Mejías aquí resumida está reñida con estos mandatos éticos. Igualmente, su conducta es contraria al mandato del Canon 29 de Etica Judicial, lo que se revela violatorio, a su vez, de los preceptos éticos contenidos en los Cánones de Ética Profesional.
En este caso, el querellado no ha expresado arrepenti-miento por el lenguaje utilizado en las comunicaciones antes reseñadas o que su conducta no habrá de repetirse en el futuro. Todo lo contrario, se ha reiterado en que su con-ducta pasada y sus expresiones estaban justificadas. Por otro lado, el querellado lleva veintiséis años en la práctica de la profesión y no surge de su expediente personal que haya incurrido anteriormente en conducta reñida con los cánones de ética profesional.
Al imponer una sanción disciplinaria hemos tomado en cuenta un sinnúmero de factores, como por ejemplo: la buena reputación del abogado en la comunidad, su histo-rial previo, si es la primera falta, la aceptación de la falta y su sincero arrepentimiento, si se trata de una conducta aislada, si medió un ánimo de lucro, así como cualesquiera otras consideraciones que surjan de los hechos y que pue-dan servir como atenuantes o agravantes. Véanse: In re Quiñones Ayala, supra; In re Montalvo Guzmán, 164 D.P.R. 806 (2005).
De acuerdo con lo anterior, y habiendo concluido que el querellado incurrió en las faltas éticas imputadas y que éstas tienden a minar gravemente la confianza de la ciu-dadanía en la Judicatura, consideramos insuficiente que, como sanción, nos limitemos a censurar enérgicamente al querellado. Disentimos de este curso de acción. En su lu-gar, separaríamos al querellado del ejercicio de la profesión por un término de seis meses.

 El Art. V, Sec. 11 de la Constitución de Puerto Rico establece que
“[l]os jueces del Tribunal Supremo podrán ser destituidos por las causas y me-diante el procedimiento que esta Constitución establece en la Sección 21 del Artículo III. Los jueces de los demás tribunales podrán ser destituidos por el Tribunal Supremo por las causas y mediante el procedimiento que se disponga por ley.” L.P.R.A., Tomo 1, ed. 2008, pág. 418.

 En la carta que dirigió a los abogados y abogadas, el querellado señala que la Comisión de Evaluación Judicial atropelló su dignidad con la evaluación que le hicieron. Así, describe como un acto de maldad e infamia dicha evaluación. Todo esto sin tener prueba que sustente su postura.
Además, en la Carta de 16 de julio de 2007 dirigida al Juez Presidente, el querellado objetó el informe emitido por la Comisión de Evaluación Judicial. Adujo que ésta no había actuado en forma justa, imparcial y diligente; que había llevado a cabo una aberrada evaluación; que lo habían tratado como una cosa u objeto; que había llegado a unas conclusiones sobre su labor totalmente sesgadas; que si tuviera que abandonar la Rama Judicial lo haría con la frente en alto, con la satisfacción del deber excelentemente cumplido y con el mal sabor de que los llamados por antono-masia a impartir justicia no lo hicieron con uno de sus pares, etcétera.

 En septiembre de 2007, la entonces subsecretaría del Departamento de Jus-ticia le remitió a la Directora Administrativa de la Oficina de Administración de los Tribunales una comunicación en la cual le refería una carta del juez Gaetán Mejías que había recibido el Secretario de Justicia, Hon. Roberto José Sánchez Ramos, con fecha de 31 de agosto de 2007. En la referida carta, el juez Gaetán Mejías le infor-maba al Secretario que su nombramiento vencía el 17 de diciembre de 2007 y le agradecía a los abogados y fiscales del Departamento que habían postulado ante él. A la comunicación enviada le anejó copia de cuarenta y siete cartas de abogados que habían postulado ante él y le habían remitido al Sr. Hugo Díaz sendas cartas de recomendación.

 Varios de los abogados que enviaron una carta de recomendación recibieron una carta de agradecimiento del licenciado Gaetán y Mejías en la cual éste les agra-decía el envío de la carta:
“Estamos profundamente agradecidos por su noble gesto de cortesía y, sobre todo, por coadyuvar [sic] en tratar de evitar que se cometa una injusticia más, de las muchas que se cometen a diario por personas que no tienen conciencia del daño emocional que acarrean a los afectados.” (Énfasis nuestro.) Exhibit 2P.

 La Comisión de Evaluación Judicial realiza, fundamentalmente, dos tipos de evaluaciones, a saber: las evaluaciones periódicas detalladas provistas en ley sobre el desempeño judicial del juez, y aquellas evaluaciones motivadas por solicitudes de ascenso o renominación. Véase 4 L.P.R.A. secs. 73j y 731.

 El profesor Brody, en su artículo sobre los mecanismos de evaluación del desempeño judicial, nos dice específicamente:
“An important component of public trust in governmental institutions is the citizenry’s ability to hold its officers accountable. A governmental institution that is viewed as unaccountable is likely to lack public trust. On the other hand, as public accountability increases, the trust afforded the institution is likely as well.
“Beyond increasing perceived legitimacy, the public’s ability to effectively hold judges accountable ... a ‘reservoir of loyalty’ upon which the judiciary can draw. This reservoir grows as the public’s trust in the courts and judiciary operate effectively in a transparent manner. After time, this reservoir can be drawn upon by judges to foster the acceptance and understanding of politically unpopular decisions that courts are required to make. Such public acceptance in turn serves to increase judicial independence and the ability to make difficult decisions without concern for political ramifications.” D. Brody, The use of Judicial Performance Evaluation to Enhance Judicial Accountability, Judicial Independence, and Public Trust, 86 Denv. U.L. Rev. 115, 125-126 (2008).